UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS AND ASBESTOS WORKERS LOCAL #6 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,  Plaintiff,  vs.  INTERNATIONAL BUSINESS MACHINES CORPORATION, VIRGINIA M. ROMETTY, MARTIN J. SCHROETER and JAMES J. KAVANAUGH,  Defendants. | **15 CV 2492**  No.  CLASS ACTION  COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS  JURY TRIAL DEMANDED |

RECEIVED
APR 0 1 2015
U.S.D.C. S.D. N.Y.

JUDGE BRICCETTI

Plaintiff, International Association of Heat and Frost Insulators and Asbestos Workers Local #6 Pension Fund ("Insulators Local 6 Pension Fund" or "Plaintiff"), by and through its undersigned counsel, alleges the following individually and on behalf of a class of all persons and entities similarly situated, upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's allegations are based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by International Business Machines Corporation ("IBM" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity

for discovery.

## INTRODUCTION

1.     This is a federal securities class action brought on behalf of all persons or entities

who purchased or otherwise acquired the publicly-traded securities of IBM between January 22,

2014 and October 17, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the

Securities Exchange Act of 1934 (the "Exchange Act") against IBM and certain of its officers.

2.     IBM is a global information technology company founded in 1911 and based in

Armonk, New York.  The Company manufactures and sells computer hardware and software and

offers a variety of technology services.

3.     IBM has endeavored to transform its business in light of a changing technology

landscape, and has recently sought to shed some of its hardware businesses as they have grown

less profitable.

4.     As early as 2013, and prior to the beginning of the Class Period, IBM sought a

buyer for the segment of its hardware business responsible for the design and production of

microchips (the "Microelectronics business").  The Microelectronics business included long-

lived property, plant, and equipment assets reflected on IBM's balance sheet at a value of

approximately $2.4 billion.

5.     Unbeknownst to investors at the time, IBM struggled to find a buyer for the

segment, which had incurred a $700 million loss in 2013 and was on track for a similar loss in

2014.  Based on these losses and IBM's fruitless early efforts to sell the business, Defendants

knew or recklessly disregarded evidence that the long-lived assets of the Microelectronics

business were worthless, and that IBM would be lucky even to get $1 billion for the money-

2

losing Microelectronics business based on the engineering expertise and intellectual property associated therewith.

6.      Despite this knowledge, during the Class Period Defendants materially misrepresented the value of IBM's Microelectronics business and failed to disclose the segment's $700 million loss in 2013, artificially inflating the Company's results and guidance.

7.      The truth was revealed on October 20, 2014, when IBM announced an agreement to transfer its Microelectronics business to GlobalFoundries Incorporated ("GlobalFoundries") along with *a $1.5 billion incentive payment*.  In conjunction with the announcement, IBM revealed that the Microelectronics business had lost more than $700 million in 2013, and expected comparable losses for 2014.  The Company also disclosed that it had recorded a $4.7 billion charge, due in part to a $2.4 billion write-down of *the entire value* of the long-lived property, plant, and equipment assets of the Microelectronics business.

8.      When the truth regarding the value of IBM's Microelectronics business was revealed to investors on October 20, 2014, the Company's share price dramatically declined on massive trading volume, falling 7.11%, or $12.95 per share, from $182.05 per share at closing on October 17, 2014, to $169.10 on October 20, 2014.

9.      As a result of Defendants' materially false and/or misleading statements and omissions, IBM's securities traded at inflated prices during the Class Period.  However, as the truth about IBM's operating performance and outlook became known to investors, the artificial inflation was dispelled and the price of IBM's common stock fell, declining by nineteen percent from its Class Period high.  These price declines caused significant losses and damages to Plaintiff and other members of the Class.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange

Act, 15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC,

17 C.P.R. § 240.10b-5.

11.     This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Exchange Act, 28 U.S.C. § 1331 (15 U.S.C. § 78a(a)).

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and

28 U.S.C. § 1391(b).  IBM is incorporated in New York and its principal executive offices are

located in this District.  The conduct alleged herein occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the national

securities markets.

## PARTIES

14.     Plaintiff, Insulators Local 6 Pension Fund, is based in Dorchester, Massachusetts

and provides pension benefits to active and retired members.  Plaintiff purchased IBM securities

during the Class Period, as set forth in the certification attached hereto, and was damaged as a

result of Defendants' wrongdoing as alleged in this complaint.

15.     Defendant IBM is a New York corporation that provides information technology

hardware and services around the world.  IBM maintains its principal executive offices at 1 New

Orchard Road, Armonk, New York 10504.  IBM's common stock is listed on the New York

Stock Exchange, where it trades under the ticker symbol "IBM."

16.     Defendant Virginia M. Rometty ("Rometty") is, and was at all relevant times, the

President, Chief Executive Officer ("CEO"), a director and the Chairman of the Board of IBM.

Throughout the Class Period, CEO Rometty spoke to investors as part of the Company's regularly scheduled discussions relating to operating results and signed and certified the accuracy of IBM's periodic filings with the SEC.

17.     Defendant Martin J. Schroeter ("Schroeter") is, and was at all relevant times, Senior Vice President and Chief Financial Officer ("CFO") at IBM.  Throughout the Class Period, CFO Schroeter spoke to investors as part of the Company's regularly scheduled discussions relating to operating results and signed and certified the accuracy of IBM's periodic filings with the SEC.

18.     Defendant James J. Kavanaugh ("Kavanaugh") was at all relevant times Vice President and Controller of IBM.  Throughout the Class Period, Controller Kavanaugh signed and certified the accuracy of IBM's periodic filings with the SEC.  In January 2015, Kavanaugh was appointed to the new position of Senior Vice President, Transformation and Operations, "responsible for creating an operating model which will allow IBM to align to fundamental market shifts while driving speed and agility."

19.     Defendants Rometty, Schroeter, and Kavanaugh are collectively referred to herein as the "Individual Defendants."  Together with Defendant IBM, the Individual Defendants are collectively referred to herein as "Defendants."

## BACKGROUND

20.     IBM is a global information technology company operating in five segments: (1) Global Technology Services, which primarily provides IT infrastructure services and business process services; (2) Global Business Services, which provides professional services and application management services; (3) Software, which consists primarily of middleware and operating systems software; (4) Systems and Technology, which provides business products

requiring advanced computing power and storage capabilities; and (5) Global Financing, which invests in financing assets, leverages with debt, and manages the associated risks.

21.     The Systems and Technology Segment is focused on business products requiring advanced computing power and storage capabilities. Among other things, Systems and Technology provides hardware, including semiconductor technology, products, and packaging for other IBM units and external clients.

22.     IBM operated its Microelectronics business within its Systems and Technology Segment. The Microelectronics business was primarily responsible for the design and production of microchips, and included assets such as plant, property, and equipment, goodwill, manufacturing inventory, accounts receivables, and, notably, IBM's long-lived semiconductor manufacturing operations and facilities in East Fishkill, Dutchess County, New York, and in Essex Junction, Vermont.

23.     While the Microelectronics business included intellectual property on which the Company's success had once depended, as the technology field changed, profits became harder to achieve and the Microelectronics business began losing money.

24.     Since the mid-2000s, IBM has articulated a plan to divest the Company of hardware businesses in order to focus on higher growth areas.

25.     In May 2007, the Company set out its "2010 Earnings Per Share ("EPS") Roadmap," which explained how IBM expected to achieve EPS growth of 14 to 16 percent and $10 to $11 in EPS by 2010. At that time, the Company highlighted its strategy of exiting hardware businesses and strengthening its position in services and software.

26.     IBM achieved and exceeded its 2010 Roadmap guidepost, recording EPS of $11.52 for 2010.

27.     During a May 2010 Investor Day, former IBM CEO, Sam Palmisano, set another EPS guidepost during a presentation, the "2015 Roadmap," which laid out IBM's plan to deliver EPS of at least $20 by 2015.

28.     The 2015 Roadmap was described by the Company as leveraging the transformation of its base business, including divestitures from hardware and a shift to higher growth businesses, such that hardware and financing would decrease from 35% of operating segments profit in 2000 to 13% in 2015.

29.     Consistent with the plan set forth in the 2015 Roadmap, at least as early as 2013, IBM began looking for a buyer for the Microelectronics business.  IBM knew that the Microelectronics business was on track to incur a loss of $700 million in 2013 and a similar 2014 loss, and wanted to unload the business in short order.

30.     IBM had difficulty locking in a buyer, however, and appointed Goldman Sachs Group, Inc. ("Goldman Sachs") to try to find potential buyers for its Microelectronics business.

31.     Even after the retention of Goldman Sachs, IBM was unable to find a buyer willing to pay an amount even close to the value of the foundry that it had listed on its books. IBM had held talks with various chip makers regarding the sale of its Microelectronics business, including GlobalFoundries, Intel Corporation, and Taiwan Semiconductor Manufacturing Company.  Although IBM was asking for more than $2 billion for its Microelectronics business, bidders were unwilling to pay much more than $1 billion, and were primarily interested in acquiring IBM's engineering expertise and intellectual property, rather than the manufacturing facilities.  GlobalFoundries emerged as the leading candidate to buy IBM's semiconductor-making operations, but noted outstanding issues concerning price and intellectual property.

32.     Under U.S. Generally Accepted Accounting Principles ("GAAP"), a company must recognize an impairment loss when the carrying cost of a long-lived asset is not recoverable and exceeds the asset's fair value. Such assets must be reviewed for an impairment in value when facts or circumstances indicate that the carrying value may be greater than the sum of the undiscounted cash flows expected from the asset's use and disposal.

33.     Under accounting rules and the regulations established by the Sarbanes-Oxley Act of 2002, IBM was responsible for routinely assessing whether impairment indicators were present, and was required to have systems or processes in place to assist in the identification of potential impairment indicators.

34.     The 2013 operating losses in the Microelectronics business, as well as IBM's decision to sell the Microelectronics business triggered impairment testing on the Microelectronics business and put Defendants on notice that the carrying value of the long-lived assets associated with the business should have been impaired and reported no later than the quarter ended December 31, 2013.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

35.     Following the close of the markets on January 21, 2014, IBM issued a press release reporting its financial and operating results for the fourth quarter and full year ended December 31, 2013. Therein, the Company "announced fourth-quarter 2013 diluted earnings of $5.73 per share, compared with diluted earnings of $5.13 per share in the fourth quarter of 2012, an increase of 12 percent" and "[o]perating (non-GAAP) diluted earnings [of] $6.13 per share, compared with operating diluted earnings of $5.39 per share in the fourth quarter of 2012, an increase of 14 percent."

36.     The press release stated in part, quoting CEO Rometty:

8

We continued to drive strong results across much of our portfolio and again grew earnings per share in 2013. . . .

As we enter 2014, we will continue to transform our business and invest aggressively in the areas that will drive growth and higher value. *We remain on track toward our 2015 roadmap for operating EPS of at least $20,*[1] a step in our long-term strategy of industry leadership and continuous transformation.

37.     In conjunction with the announcement, IBM held a conference call after the market close on January 21, 2014, with analysts and investors to discuss earnings and operations.

Regarding earnings guidance for 2014, CFO Schroeder stated, in part:

So I want to start out by saying that we continue to expect to deliver *at least $20 of operating EPS in 2015*. We'll talk about 2014 a little later, and you'll see that our view of 2014 keeps us on track to that objective.

\*               \*               \*

As always, we're positioning our business for the future. And as I noted, we continue to expect to achieve *at least $20 in 2015 along the way*.

\*               \*               \*

As we look forward to 2014, we'll continue our transformation, shifting our investments to the growth areas, and mixing to higher value. We'll acquire key capabilities. We'll divest businesses, and we'll rebalance our workforce as we continue to return value to shareholders.

Our current view of all of this is included in our expectation of *at least $18 of operating EPS in 2014*. That's up 10.5% from $16.28 in 2013.

We'll see the benefits of the first quarter rebalancing action later in the year. As a result, we expect our first quarter EPS to be about 14% of the full year, reflecting the modest gain, workforce rebalancing charge, and continued impact from currency. For these reasons, our first quarter skew in 2014 should be lower than our historical skew, which has been about 18% of the full year over the last few years.

---

[1]   All emphases herein are added.

> And importantly, we expect to grow our free cash flow in 2014 by about $1 billion. That's faster than net income, even after absorbing another significant cash tax headwind, and growing capital expenditures. ***All of this keeps us on track to our 2015 objective of at least $20 of operating EPS.***

38.    On February 25, 2014, IBM filed with the SEC an annual report on Form 10-K for the fourth quarter and full year ended December 31, 2013, which incorporated by reference the financial statements set forth in the 2013 Annual Report to Investors.

39.    In particular, the Annual Report included the following representations about IBM's accounting practices:

> The Consolidated Financial Statements and the Notes have been prepared in accordance with accounting principles generally accepted in the United States (GAAP).

> \*              \*              \*

> ***Long-lived assets, other than goodwill and indefinite-lived intangible assets, are tested for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.*** The impairment test is based on undiscounted cash flows and, if impaired, the asset is written down to fair value based on either discounted cash flows or appraised values. Goodwill and indefinite-lived intangible assets are tested annually, in the fourth quarter, for impairment and whenever changes in circumstances indicate an impairment may exist.  Goodwill is tested at the reporting unit level which is the operating segment, or a business, which is one level below that operating segment (the "component" level) if discrete financial information is prepared and regularly reviewed by management at the segment level. Components are aggregated as a single reporting unit if they have similar economic characteristics.

40.    The financial statements in the 2013 Annual Report contained representations regarding the operations of IBM's Systems and Technology Segment, its management's discussion and analysis, its disclosure controls and internal controls over financial reporting, and certifications thereon by CEO Rometty and CFO Schroeter.  In part the report stated:

| ($ in millions)<br>For the year ended December 31: | 2013 | 2012 | Yr. to Yr.<br>Percent/Margin<br>Change |
|---|---|---|---|
| Systems and Technology: | | | |
| External gross profit | $ 5,120 | $ 6,903 | (25.8)% |
| External gross profit margin | 35.6% | 39.1% | (3.5) pts. |
| Pre-tax income | $ (507) | $ 1,227 | Not Meaningful |
| Pre-tax margin | (3.4)% | (6.7)% | (10.1) pts. |

Systems and Technology's gross profit margin decreased 5.5 points in the fourth quarter of 2013 versus the prior year. The decrease was driven by lower margins in Power Systems (1.3 points), System x (1.2 points), Storage (0.6 points), Microelectronics (0.5 points) and a decline due to revenue mix (2.2 points). Systems and Technology's pre-tax income decreased $768 million or 78.8 percent in the fourth quarter, and pre-tax margin decreased 11.7 points versus the prior year period.

41.    The Company's Form 10-K included the following representations regarding controls and procedures at Item 9A, and a certification signed by CEO Rometty, incorporated therein as Exhibit 31.1, which stated:

> The company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the company's disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the company's disclosure controls and procedures were effective as of the end of the period covered by this report.

> Refer to "Report of Management" and "Report of Independent Registered Public Accounting Firm" on pages 76 and 77 of IBM's 2013 Annual Report to Stockholders, which are incorporated herein by reference. There has been no change in the company's internal control over financial reporting that occurred during the fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.

*              *              *

I, Virginia M. Rometty, certify that:

1. I have reviewed this annual report on Form 10-K of International Business Machines Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      c.    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      d.    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

    5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a.    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b.    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

42.    The Company's Form 10-K also included a substantially similar certification, signed by CFO Schroeter, as Exhibit 31.2.

43.    After the close of trading on April 16, 2014, IBM issued a press release announcing its financial results for the first quarter of 2014 ended March 31, 2014. For the 2014

first quarter, the Company reported diluted earnings of $2.29 per share and operating (non-

GAAP) diluted earnings of $2.54 per share.  CEO Rometty commented on the results, stating, in

part:

> In the first quarter, we continued to take actions to transform parts
> of the business and to shift aggressively to our strategic growth
> areas including cloud, big data analytics, social, mobile and
> security . . . .
>
> As we move through 2014, we will begin to see the benefits from
> these actions.  Over the long term, they will position us to drive
> growth and higher value for our clients.

44.      IBM held a conference call with analysts and investors following the earnings

announcement on April 16, 2014.  Regarding the earnings guidance for 2014, CFO Schroeter

stated, in part:

> For the year, we expect to deliver **_at least $18 of operating
> earnings per share for 2014_**.  This does not include any gain from
> the sale of our System x business to Lenovo because of the
> uncertainty of the timing and amount, but it will ultimately be
> included in our operating EPS results, and we'll update you later in
> the year.
>
> Like always, we manage our business and allocate capital for the
> long term, and along the way, we still expect to deliver **_at least $20
> of operating EPS in 2015_**.
>
>         *        *        *
>
> In terms of the $18, we said that we would get to at least $18.  We
> said in the first quarter that we would do about 14% of that, and
> that's where we came in, at 14%.
>
>         *        *        *
>
> Given that quarterly phenomenon, a charge in the first quarter of
> this year but none the second versus the prior, we would think that
> the first half . . . is going to look a lot like last year, and we'll
> probably get about 38% of our full year EPS done by the end of the
> first half.

And then when we look at the second half, we'll see consistent growth with what we need on a full year basis at 10.5, and given the transactional nature and the momentum in some of our businesses, we would say it would probably be a little bit faster in the fourth than in the third.

45.     On April 29, 2014, IBM filed its quarterly report on Form 10-Q for the quarter ended March 30, 2014 with the SEC, signed by Controller Kavanaugh (the "First Quarter 10-Q"). The First Quarter 10-Q contained financial statements that represented, among other things, that:

> The accompanying Consolidated Financial Statements and footnotes of the International Business Machines Corporation (IBM or the company) have been prepared in accordance with accounting principles generally accepted in the United States of America (GAAP).
>
> *     *     *
>
> ***Non-financial assets such as property, plant and equipment, land, goodwill and intangible assets are also subject to nonrecurring fair value measurements if they are deemed to be impaired.*** The impairment models used for nonfinancial assets depend on the type of asset. See Note A, "Significant Accounting Policies - Impairment," on page 88 in the company's 2013 Annual Report for additional information. ***There were no material impairments of non-financial assets for the three months ended March 31, 2014 and 2013, respectively.***

46.     The First Quarter 2014 10-Q financial statements were also certified by CEO Rometty and CFO Schroeter and subject to representations regarding IBM's disclosure and internal controls substantially similar in all material respects to those set forth in ¶ 41.

47.     The First Quarter 2014 10-Q also contained representations regarding the operations of IBM's Systems and Technology segment. In part, the 10-Q stated:

| (Dollars in millions)<br>For the three months ended March 31: | 2014 | 2013 | Yr. to Yr.<br>Percent/Margin<br>Change |
|---|---|---|---|
| Systems and Technology: | | | |
| External gross profit | $ 645 | $ 1,003 | (35.7)% |
| External gross profit margin | 27.0% | 32.3% | (5.3) pts. |
| Pre-tax income | $ (660) | $ (405) | (63.1)% |
| Pre-tax margin | (25.8)% | (12.5)% | (13.2) pts. |

Systems and Technology's gross profit margin decreased 5.3 points in the first quarter of 2014 versus the prior year. The decrease was driven by a decline due to revenue mix as a result of less mainframe content (2.3 points), lower margins in Power Systems (1.7 points), Microelectronics (1.3 points) and Storage (0.9 points), partially offset by higher margins in System z (0.2 points) and System x (0.1 points).

Systems and Technology's pre-tax loss increased $255 million to a loss of $660 million in the first quarter 2014, when compared to the prior year. Pre-tax margin decreased 13.2 points in the first quarter versus the prior year period. Normalized for workforce rebalancing charges of $218 million and $3 million in the first quarter of 2014 and 2013, respectively, Systems and Technology's first quarter pre-tax income was a loss of $442 million compared to a loss of $402 million in the prior year, and the pre-tax margin declined 4.8 points.

48.    On July 17, 2014, IBM issued a press release announcing its financial results for its 2014 second quarter ended June 30, 2014.  For the 2014 second quarter, the Company reported diluted earnings of $4.12 per share and operating (non-GAAP) diluted earnings of $4.32 per share.  CEO Rometty commented on the results, stating, in part:

In the second quarter, we made further progress on our transformation.  We performed well in our strategic imperatives around cloud, big data and analytics, security and mobile . . . .  We will continue to extend and leverage our unique strengths to address the emerging trends in enterprise IT and transform our business, positioning ourselves for growth over the long term.

49.     Following the earnings release, IBM held a conference call with analysts and investors to discuss its earnings and operations.  During the conference call, CFO Schroeter made statements about the Company's earnings and outlook, stating, in part:

> Let me spend a minute on the first-half performance.  The revenue performance for the half is very similar to the second quarter. Through six months we had double-digit revenue growth in strategic initiatives, stable performance in our core franchises, and the impact of some secular trends in parts of hardware and from the divested business.
>
> Looking at profit, we expanded gross margin 50 basis points, pre-tax margin by 70 basis points, and net margin by 50 basis points. All while shifting investment to key areas.  Operating earnings per share for the first half were up 9.5%.
>
> \*                       \*                       \*
>
> Systems and Technology revenue of $3.3 billion was down 11%. This is a significant improvement in the year-to-year performance compared to last quarter.  The improvement was driven by system z, as well as sequential improvements in system x and storage. This, together with actions to align our structure to the demand profile, result[ed in] progress in stabilizing our profit.

50.     CFO Schroeter also spoke about IBM's 2014 earnings guidance, stating in part:

> As we look to the full year of 2014, we expect to deliver *at least $18 of operating earnings per share and we still expect to deliver at least $20 of operating earnings per share in 2015*.  These are points along the way to delivering performance, and shareholder value over the long term.
>
> \*                       \*                       \*
>
> In the second half, we see . . . our software revenue growth accelerating to mid-single digit.  And we see our services profit growth of mid-single digit driven by productivity in the base.  And then on STG . . . , we see that profit stabilization still.  So when I think about the second half, and how that plays out, as we said 90 days ago, . . . I think EPS growth in the second half will be a little bit faster in the fourth than in the third.  So kind of double-digit fourth quarter EPS and a single-digit third quarter EPS.

And bear in mind that single-digit EPS growth even in the third, because of seasonality kind of translates to, no more absolute EPS than what we got in the second.

51.   On July 29, 2014, IBM filed its Form 10-Q for the quarter ended June 30, 2014 ("Second Quarter 10-Q"), signed by Controller Kavanaugh.  The Second Quarter 10-Q financial statements were also certified by CEO Rometty and CFO Schroeter and subject to representations regarding IBM's disclosure and internal controls substantially similar in all material respects to those set forth in ¶¶ 41 and 45.

52.   The Second Quarter 10-Q also contained representations regarding IBM's Systems and Technology Segment stating, in part:

| (Dollars in millions) For the six months ended June 30: | 2014 | 2013 | Yr. to Yr. Percent/Margin Change |
|---|---|---|---|
| Systems and Technology: | | | |
| External gross profit | $  1,773 | $  2,382 | (25.6)% |
| External gross profit margin | 31.0% | 34.7% | (3.7) pts. |
| Pre-tax income | $  (635) | $  (546) | 16.3% |
| Pre-tax margin | (10.4)% | (7.7)% | (2.8) pts. |

Systems and Technology's gross profit margin decreased 2.8 points in the second quarter of 2014 versus the prior year. The decrease was driven by lower margins in Power Systems (1.1 points), Storage (0.9 points), Microelectronics (0.8 points) and System x (0.8 points), partially offset by an improvement due to revenue mix (0.4 points).  Gross profit margin for the first six months of 2014 decreased 3.7 points compared to the first six months of 2013. The decrease was driven by lower margins in Power Systems (1.3 points), Microelectronics (1.0 points) and Storage (0.9 points), and a decline due to revenue mix (0.7 points).

Systems and Technology's pre-tax income increased $166 million to $25 million in the second quarter and its pre-tax loss increased $89 million to $635 million for the first six months of 2014 compared to prior year periods. Pre-tax margin increased 4.3 points in the second quarter and decreased 2.8 points in the first six months versus the prior year periods. Second-quarter performance reflects a year-to-year reduction in workforce rebalancing charges of $202 million.

The company's focus for STG in 2014 is to stabilize the profit base and, after the first half of the year, the company is on track. The company will continue to make investments in this business to remain a leader in high-performance, high-end systems. In July, the company announced it will invest $3 billion over the next five years to tackle the challenges of the "post-silicon" era, demonstrating its commitment to innovation and to leading in the new era of enterprise IT.

53.     The October 20, 2014 disclosures revealed that the statements set out in ¶¶ 35-52 were materially false and misleading when made because they misrepresented and failed to disclose adverse facts, which were known to or recklessly disregarded by Defendants. The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were that: (1) IBM's Microelectronics business incurred a loss of $700 million in 2013 and expected a comparable loss for 2014; (2) the long-lived assets of IBM's Microelectronics business were worthless; (3) IBM's operating results were materially inflated due to the improper failure to timely report a $2.4 billion impairment in the value of the assets of the Microelectronics business; (4) Defendants lacked a reasonable basis for their representations that IBM was on track to achieve $18 in operating EPS in 2014; (5) IBM's financial statements were presented in violation of GAAP and were materially false and misleading; (6) IBM's annual and quarterly reports on Forms 10-K and 10-Q failed to disclose then-known events or uncertainties associated with IBM's Microelectronics business; (7) IBM's disclosure controls and internal controls over its financial reporting were materially deficient; (8) certifications issued by Defendants Rometty and Schroeter associated with IBM's disclosure controls and internal controls over IBM's financial reporting were materially false and misleading; and (9) Defendants lacked a reasonable basis for their positive statements about the Company, its business prospects, and future operating performance.

## IBM SHOCKS MARKET WITH NEWS OF THE
## TRUE VALUE OF ITS MICROELECTRONICS BUSINESS

54.     During the Class Period, in violation of applicable accounting standards, SEC

rules and regulations, and IBM's own publicly stated accounting policies, Defendants caused

IBM to conceal a $700 million loss in the Microelectronics business in 2013 and the fact that the

Company expected a comparable loss for 2014, and failed to timely record an impairment in the

value of its long-lived assets of the Microelectronics business.  As a result, IBM's reported

earnings and 2014 earnings guidance during the Class Period were artificially inflated and

materially false and misleading.

55.     To be sure, Defendants were motivated to engage in their improper course of

conduct to facilitate the sale of IBM's failing Microelectronics business.  In June 2014, the

negotiations between IBM and GlobalFoundries broke down over price.  According to reports,

GlobalFoundries had asked for a $2 billion payment for the Microelectronics business in order to

offset the unit's losses.

56.     On October 20, 2014, IBM issued startling disclosures that surprised investors

and analysts and revealed Defendants' fraudulent misrepresentations and accounting misconduct.

57.     Before the opening of trading that day, IBM and GlobalFoundries jointly

announced that they had entered into a Definitive Agreement under which GlobalFoundries

would acquire IBM's global commercial semiconductor technology, "including intellectual

property, world class technologists and technologies related to IBM Microelectronics" for cash

consideration of *$1.5 billion to be paid to GlobalFoundries by IBM*.  Under the agreement,

GlobalFoundries would continue to supply semiconductors to IBM.

58.     The press release also announced that "IBM will reflect a pre-tax charge of

$4.7 billion in its financial results for the third quarter of 2014, which includes an asset

impairment, estimated costs to sell the IBM microelectronics business and cash consideration to GlobalFoundries."

59.   Also on October 20, 2014, IBM issued a press release announcing its financial results for the third quarter ended September 30, 2014, reporting sales of $22.4 billion on continuing operations (excluding the Microelectronics business), down 4% from the third quarter of 2013, and operating profits of $3.68 per share, down 10% from the third quarter of 2013.

60.   IBM also reported that its gross profit margin from continuing operations on an operating basis was 49.2%, down 90 basis points from the third quarter of 2013.  Total revenue from IBM's Systems and Technology segment, which includes semiconductor operations, declined 15%.

61.   The earnings release quoted CEO Rometty stating that "[w]e are disappointed in our performance."

62.   The release also stated the following regarding discontinued operations:

> The loss from discontinued operations in the third quarter includes a non-recurring pre-tax charge of $4.7 billion, or $3.3 billion, net of tax.  The charge includes an impairment to reflect fair value less estimated costs to sell the Microelectronics business assets, which the company has classified as held for sale at September 30, 2014. The charge also includes other estimated costs related to the transaction, including cash consideration expected to be transferred to GLOBALFOUNDRIES of approximately $1.5 billion.  The cash consideration is expected to be paid to GLOBALFOUNDRIES over the next three years and will be adjusted by the amount of the working capital due by GLOBALFOUNDRIES to IBM, estimated to be $0.2 billion.  In addition, discontinued operations includes operational net losses from the Microelectronics business of $0.1 billion in both the third quarter of 2014 and the third quarter of 2013.

63.   During the October 20, 2014 third quarter earnings conference call, CFO Schroeter stated the following regarding the Microelectronics business:

[T]he 2013 OEM revenue associated with the divested business was $1.4 billion, and *our STG segment included pre-tax losses for this business of over $700 million.* This is being reported as a discontinued operation. In the third quarter, [discontinued operations] will include both losses from the ongoing operations of about $90 million after tax, and a one-time after-tax charge of $3.3 billion associated with the transaction. The transaction had no impact to free cash flow in the third quarter.

64.     CFO Schroeter also reduced 2014 guidance during the call, withdrawing the $20 operating EPS roadmap for 2015 and conceding that rather than $18 EPS as promised in July, "full year 2014 Operating EPS [would] be down between 2 percent and 4 percent, that's off last year's comparable base of $16.64."

65.     During the question and answer portion of the call, analysts responded with surprise to the news. Goldman Sachs analyst Bill Shope observed, "[o]bviously there's a lot of new info here," and Barclays analyst Benjamin Reitzes commented, "[w]e've just had obviously a major setback here."

66.     Brian White, a Cantor Fitzgerald analyst, queried regarding the newly released details on Microelectronics losses: "I just wanted to be clear. What did the chip business lose in 2013 and what are the expectations for loss in 2014?" CFO Schroeter responded, in part, "[in] 2013 we had a loss of $700 million on a pretax basis. And 2014 is basically flat to what we saw in 2013."

67.     *The Wall Street Journal* also published commentary on the news, observing that it was a hit specific to IBM. The *Journal* stated that IBM's "results stood in contrast to Apple Inc., which on Monday posted a 13% profit increase on strong September sales of its larger-screen iPhones."

68.     In reaction to the disclosures, IBM's stock price declined more than $12.00 per share to close at $169.10 per share on October 20, 2014 on high trading volume.

69.     During the Class Period, IBM stock traded as high as $199.21 per share in intraday trading on April 10, 2014.  IBM's stock price continued declining as the market absorbed the revelations, closing down at $163.23 per share on October 21, 2014 and $161.79 per share on October 22, 2014.  In the end, the price of IBM stock declined approximately 19% from its Class Period high.

70.     On October 28, 2014, IBM filed its Form 10-Q for the quarter ended September 30, 2014.  The Form 10-Q was signed by Controller Kavanaugh and reported that during the quarter, IBM wrote off the entire value of the assets of the Microelectronics business:

> In the third quarter, the company recorded a pre-tax charge of $4.7 billion related to the sale of the Microelectronics disposal group, which was part of the Systems and Technology reportable segment.  The pre-tax charge was recorded to reflect the fair value less the estimated cost of selling the disposal group including *an impairment to the semiconductor long-lived assets of $2.4 billion*, $1.5 billion representing the cash consideration expected to be transferred to GLOBALFOUNDRIES and $0.8 billion of other related costs.  The asset impairment was reflected in property, plant and equipment, net and the other costs of disposal were reflected in other accrued expenses and liabilities and other liabilities in the Consolidated Statement of Financial Position at September 30, 2014.

71.     As a result of Defendants' false statements, IBM's securities traded at artificially inflated levels during the Class Period.  When Defendants revealed the true value of IBM's Microelectronics business and improper accounting practices, the price of IBM common stock fell nearly 19% from its Class Period high.

72.     Prior to the start of the Class Period, IBM should have reduced the reported value of its Microelectronics business in its financial statements.  Instead, Defendants fraudulently misrepresented the value of the Microelectronics business materially inflating earnings and rendering earnings guidance materially false and misleading.

73.    Rather than properly testing and impairing the assets, during the Class Period, IBM assigned an approximately $2.4 billion carrying value to the Microelectronics long-lived, property, plant, and equipment assets reflected in the financial statements it filed with the SEC and issued to investors, even though Defendants knew the assets were worthless.  The Microelectronics business lost $700 million in 2013 (and was on track for a similar loss in 2014) and Defendants knew IBM would not be able to sell the Microelectronics business for more than $1 billion based only on the engineering expertise and intellectual property associated with the Microelectronics business.

74.    Accordingly, upon information and belief, Defendants knew or recklessly ignored that long-lived related assets of the Microelectronics business were worthless and should have been impaired and reported no later than the quarter ended December 31, 2013.

## CLASS ACTION ALLEGATIONS

75.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased the securities of IBM between January 22, 2014 and October 17, 2014, inclusive (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of IBM, and the directors and officers of IBM and their families and affiliates at all relevant times.

76.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of February 10, 2015, IBM had 988,424,172 common shares outstanding, owned by thousands of persons.

77.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by Defendants;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of IBM securities was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

78.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

79.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation.  Plaintiff has no interests that conflict with those of the Class.

80.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION

81.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of IBM securities, and operated as a fraud or deceit on Class

Period purchasers of IBM securities by misrepresenting the value and prospects for the Company's Microelectronics business, internal controls, and accounting compliance. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on October 20, 2014, the price of IBM securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of IBM securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

82.    IBM's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

83.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of IBM who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## ADDITIONAL ALLEGATIONS REGARDING SCIENTER

84.    During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class

Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

85.     The Individual Defendants permitted IBM to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

86.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding IBM, their control over, receipt, and/or modification of IBM's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning IBM, participated in the fraudulent scheme alleged herein.

87.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of IBM common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding IBM's business, operations, and management and the intrinsic value of IBM securities and caused Plaintiff and members of the Class to purchase IBM securities at artificially inflated prices.

## PRESUMPTION OF RELIANCE

88.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)      the Company's stock traded in an efficient market;

(d)      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)      Plaintiff and other members of the Class purchased IBM securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

89.     At all relevant times, the markets for IBM securities were efficient for the following reasons, among others:

(a)      as a regulated issuer, IBM filed periodic public reports with the SEC;

(b)      IBM regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)      IBM was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)      IBM common stock was actively traded in an efficient market, namely the New York Stock Exchange, under the ticker symbol "IBM."

90.     As a result of the foregoing, the market for IBM securities promptly digested current information regarding IBM from all publicly available sources and reflected such information in IBM's stock price. Under these circumstances, all purchasers of IBM securities

during the Class Period suffered similar injury through their purchase of IBM's securities at artificially inflated prices and the presumption of reliance applies.

91.     Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

92.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

93.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

94.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of IBM securities during the Class Period.

95.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IBM securities.  Plaintiff and the Class would not have purchased IBM securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

96.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of IBM securities during the Class Period.

## COUNT  II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

97.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

98.    The Individual Defendants acted as controlling persons of IBM within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about IBM, the Individual Defendants had the power and ability to control the actions of IBM and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiff and the members of the Class damages and interest;

C.    Awarding Plaintiff's reasonable costs, including attorneys' fees; and

   D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## JURY DEMAND

   Plaintiff demands a trial by jury.

DATED:  April 1, 2015                              Respectfully submitted,


                                                   Christopher J. Keller (CK-2347)
                                                   Michael W. Stocker (MS-1309)
                                                   Rachel A. Avan (RA-5177)
                                                   **LABATON SUCHAROW LLP**
                                                   140 Broadway
                                                   New York, New York  10005
                                                   Telephone: (212) 907-0700
                                                   Facsimile: (212) 818-0477
                                                   Email: ckeller@labaton.com
                                                   mstocker@labaton.com
                                                   ravan@labaton.com

                                                   *Counsel for Plaintiff*
                                                   *International Association of*
                                                   *Heat and Frost Insulators and*
                                                   *Asbestos Workers Local #6 Pension Fund*

## CERTIFICATION

I, Francis C. Boudrow, as Trustee of the International Association of Heat and Frost Insulators and Asbestos Workers Local #6 Pension Fund ("Insulators Local 6 Pension Fund"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Insulators Local 6 Pension Fund.  I have reviewed a complaint prepared against International Business Machines Corporation ("IBM") alleging violations of the federal securities laws, and authorized its filing;

2.      Insulators Local 6 Pension Fund did not purchase securities of IBM at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Insulators Local 6 Pension Fund is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.      Insulators Local 6 Pension Fund's transactions in IBM securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      Insulators Local 6 Pension Fund has not sought to serve as a lead plaintiff in any class action filed under the federal securities laws during the last three years;

6.      Beyond its pro rata share of any recovery, Insulators Local 6 Pension Fund will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this ___31ˢᵀ___ day of March, 2015.

*Francis C. Boudrow*

Francis C. Boudrow
*Trustee*
*International Association of Heat and Frost Insulators*
*and Asbestos Workers Local #6 Pension Fund*

2

EXHIBIT A

## TRANSACTIONS IN INTERNATIONAL BUSINESS MACHINES CORPORATION

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 03/25/14 | 495.00 | $194.68 | ($96,364.67) |
| Purchase | 03/25/14 | 30.00 | $195.21 | ($5,856.15) |
| Purchase | 03/26/14 | 125.00 | $194.81 | ($24,351.43) |
| Purchase | 04/09/14 | 30.00 | $196.75 | ($5,902.58) |
| Sale | 05/29/14 | -10.00 | $182.59 | $1,825.85 |
| Sale | 07/07/14 | -55.00 | $187.95 | $10,337.35 |
| Sale | 09/16/14 | -70.00 | $191.46 | $13,402.11 |
| Sale | 10/14/14 | -120.00 | $184.44 | $22,132.81 |
| Sale | 10/14/14 | -10.00 | $184.63 | $1,846.25 |
| Sale | 10/15/14 | -60.00 | $179.52 | $10,771.26 |
| Sale | 10/15/14 | -140.00 | $179.70 | $25,158.04 |
| Sale | 10/15/14 | -20.00 | $180.66 | $3,613.12 |