UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS AND ASBESTOS WORKERS LOCAL #6 PENSION FUND, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>　　　　- against -<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION, VIRGINIA M. ROMETTY, MARTIN J. SCHROETER and JAMES J. KAVANAUGH,<br><br>　　　　　　　　　　　Defendants. | No. 15 Civ. 2492 (WHP)<br><br>Jury Trial Demanded |

**AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION.................................................................................1

II.     JURISDICTION AND VENUE...........................................................................4

III.    PARTIES .............................................................................................................5

        A.      Lead Plaintiff ..........................................................................................5

        B.      Defendants...............................................................................................5

        C.      Relevant Non-Parties ..............................................................................8

IV.     FACTUAL BACKGROUND AND
        SUBSTANTIVE ALLEGATIONS .....................................................................9

        A.      IBM as "Big Blue".................................................................................9

        B.      Rapidly Changing Technology
                Demands a New Business Model .............................................................9

        C.      IBM's Successful "2010 Roadmap"
                to Achieve $10 EPS ..............................................................................11

        D.      IBM's Failed "2015 Roadmap"
                to Double EPS to $20 ...........................................................................11

        E.      IBM Attempts to Sell Microelectronics
                for Billions Before Agreeing to Give the
                Unit and $1.5 Billion to GlobalFoundries ...........................................13

        F.      IBM Microelectronics: A Brief Primer .................................................14

                1.      The Microchip Manufacturing Process .......................................14

                2.      Scale Is the Key to Profitable Chip-Making—
                        And IBM Lacked Scale Entirely .................................................18

                3.      The Global Market for Microchips in
                        2013 Favored Chips IBM Did Not Make ..................................20

        G.      The East Fishkill Fab Was Obsolete......................................................21

        H.      The Essex Junction Fab Was Obsolete ..................................................24

V.      DEFENDANTS KNOWINGLY OR RECKLESSLY
        VIOLATED GAAP WITH RESPECT TO THE CARRYING
        VALUE OF MICROELECTRONICS' LONG-LIVED ASSETS...................26

A.     GAAP Rules on Asset Recoverability Testing ................................................... 26

B.     Defendants Knew or Recklessly Disregarded
That Microelectronics' Assets Were Impaired ...................................................... 29

      1.     Defendants Knew or Recklessly
Disregarded That IBM Intended to Sell
the Microelectronics Unit Before 2014 ..................................................... 29

      2.     Microelectronics' Heavy and Consistent
Losses Establish That IBM Violated GAAP ............................................ 30

      3.     Defendants Knew or Recklessly Disregarded
That Microelectronics' Asset Carrying
Value Was Significantly Overstated ........................................................ 31

C.     IBM Improperly Delayed Recognition of an
Impairment Charge Until the Sale to GlobalFoundries ........................................ 32

D.     IBM's Financial Statements Concealed the Impairment
and Lack of Value of the Microelectronics Assets ................................................ 34

      1.     Estimate of IBM's Restated
EPS and Net Income .................................................................................. 35

      2.     The Misstatements of IBM's
Financial Results for Year-End 2013
and Subsequent Quarters Were Material .................................................. 36

      3.     Qualitative Factors Further Demonstrate
the Materiality of IBM's Misstatements ................................................... 36

VI.    THE TRUTH EMERGES ............................................................................... 37

A.     Defendants Announce the Divestment of
the Microelectronics Business and its Impact
on the Company's Financial Results ..................................................................... 37

B.     Reaction to IBM's Announcement ....................................................................... 41

      1.     Stock Price Reaction ................................................................................. 41

      2.     Press and Analyst Reactions ..................................................................... 43

C.     IBM Files Its Form 10-Q for Third Quarter 2014 ............................................... 45

VII.   ADDITIONAL ALLEGATIONS OF SCIENTER ......................................... 46

VIII.   DEFENDANTS' MATERIALLY FALSE AND
MISLEADING STATEMENTS AND OMISSIONS .......................................52

     A.    Fourth Quarter 2013 Financial
Results and EPS Guidance ........................................................52

     B.    Form 10-K and Annual Report to Investors ...............................55

     C.    First Quarter 2014 Financial
Results and EPS Guidance ........................................................60

     D.    Form 10-Q for First Quarter 2014 .............................................62

     E.    Second Quarter 2014 Financial
Results and EPS Guidance ........................................................64

     F.    Form 10-Q for Second Quarter 2014 .........................................67

IX.    LOSS CAUSATION AND ECONOMIC LOSS ........................................69

X.     INDIVIDUAL DEFENDANT AND
CONTROLLING PERSON ALLEGATIONS ...........................................70

XI.    CLASS ACTION ALLEGATIONS ...........................................................71

XII.   LEAD PLAINTIFF AND CLASS MEMBERS ARE
ENTITLED TO A PRESUMPTION OF RELIANCE .................................74

XIII.  THE STATUTORY SAFE HARBOR AND
BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ...................76

XIV.  CAUSES OF ACTION ..............................................................................77

     COUNT I Asserted Against Defendant IBM for
Violations of Section 10(b) of the Securities Exchange
Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder.............................77

     COUNT II Asserted Against the Individual Defendants
for Violations of Section 10(b) of the Securities Exchange
Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder.............................80

     COUNT III Asserted Against the Individual Defendants for
Violations of Section 20(a) of the Securities Exchange Act of 1934.............................84

XV.   PRAYER FOR RELIEF .............................................................................85

XVI.  JURY DEMAND .......................................................................................85

Court-appointed Lead Plaintiff KBC Asset Management NV ("Lead Plaintiff" or "KBC"), by and through its undersigned counsel, alleges the following individually and on behalf of a class of all persons and entities that purchased or otherwise acquired the common stock of International Business Machines Corporation ("IBM" or the "Company") between January 22, 2014 and October 17, 2014, inclusive (the "Class Period" and the "Class," as further defined herein) upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.  The allegations of Lead Plaintiff are based upon the investigation of its counsel, which included a review of reports filed by IBM with the U.S. Securities and Exchange Commission ("SEC"); press releases and other public statements issued by IBM; securities analysts' reports about IBM; media and news reports concerning IBM; data and other information concerning IBM securities; other publicly available information concerning the Company and the Individual Defendants (as defined below); interviews with former employees of IBM; interviews with current and former employees of GlobalFoundries Inc. ("GlobalFoundries"); and discussions with consulting experts in accounting and damages and the semiconductor industry.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.    **NATURE OF THE ACTION**

1.      This securities class action concerns IBM's "sale" of its Microelectronics unit, the segment of the Company's hardware business responsible for the design and production of microchips, to competing chip-maker GlobalFoundries.  The Microelectronics unit held long-lived property, plant, and equipment assets, in two manufacturing facilities in New York State and Vermont, that Defendants valued internally at $2.4 billion and were reflected accordingly in IBM's publicly reported financial statements during the Class Period.

2.       The Microelectronics assets were actually worth *nothing*, however, as Defendants were compelled to acknowledge upon announcing the deal with GlobalFoundries.  Not only did IBM receive zero dollars for the Microelectronics unit, but IBM *paid GlobalFoundries $1.5 billion* as a cash incentive to take the unit off the Company's hands.

3.       Defendants had been attempting to sell the Microelectronics unit since 2013, as part of its much-touted "2015 Roadmap" strategy to double earnings per share ("EPS") to $20. IBM had aggressively pursued a major shift in its operations away from older-line hardware businesses toward more flexible, data-driven and service-based offerings that better reflected the nature of the market and the expected future needs of the Company's customers.  Defendant Virginia Rometty, in particular, helped conceive the 2015 Roadmap when she worked under then-CEO Samuel Palmisano, and took ownership of the strategy when she became CEO in January 2012.

4.       The Microelectronics unit was a low-margin, capital-intensive "commoditizing business" that was a serious drag on the Company's EPS and profits.  Unbeknownst to investors, Microelectronics had been losing well in excess of half a billion dollars a year.  Moreover, the unit's microchip factories had aged and were not keeping pace with rapid advances in semiconductor technology, and would require billions of dollars in capital investment to make them profitable.  Defendants had no incentive to invest in business units that were slated for divestment.

5.       In short, Microelectronics was an albatross that Defendants were eager to unload consistent with the 2015 Roadmap and the Company's overall business objectives.

6.       Even after hiring Goldman Sachs to shop the unit, however, Defendants struggled to find a buyer willing to pay an amount even close to the $2.4 billion value IBM listed on its

books.  IBM held talks with all of the realistic potential buyers, including Intel Corporation ("Intel"), Samsung Electronics ("Samsung"), and Taiwan Semiconductor Manufacturing Company ("TSMC") as well as GlobalFoundries.  IBM asked for $2 billion for the unit, but these prospective buyers were unwilling to pay substantially more than $1 billion, and were interested primarily in acquiring the Company's intellectual property and technology and engineering expertise, rather than the chip factories.

7.      In or about August 2014, GlobalFoundries emerged as the leading candidate, but talks broke off after IBM agreed to pay GlobalFoundries only $1 billion to take the unit, rather than the $2 billion GlobalFoundries had been demanding.

8.      Under Generally Accepted Accounting Principles ("GAAP"), a company must recognize an impairment loss when the carrying amount of a long-lived asset is not recoverable and exceeds the asset's fair market value.  Such long-lived assets must be reviewed, or tested, for recoverability when facts or circumstances indicate that the carrying value may be greater than the sum of the undiscounted cash flows expected from the asset's use and disposal.

9.      Defendants' unsuccessful efforts to sell the Microelectronics unit, the enormous current and projected losses in the business, and the near-obsolescence of the unit's chip factories provided Defendants with substantial objective evidence that the $2.4 billion carrying value of Microelectronics' long-lived assets was significantly overstated.  Driven by the 2015 Roadmap to boost EPS, however, Defendants disregarded these indicators of impairment and failed to test the assets for recoverability as required by GAAP, or tested the assets and failed to record the resulting impairment loss.  IBM's financial statements, including reported net income and EPS, and EPS guidance during the Class Period were materially false and misleading as a result.

3

10.     The actual carrying value of Microelectronics' long-lived assets was ultimately revealed on October 20, 2014, when IBM announced that in agreeing to transfer the Microelectronics business to GlobalFoundries, the Company would take an extraordinary charge of *$4.7 billion*, comprised of a $2.4 billion write-down of the *entire value* of the assets, the $1.5 billion cash payment to GlobalFoundries, and $800 million in other unspecified costs.

11.     IBM also announced disastrous financial results for the third quarter of 2014, with a 96% drop in net profit for the quarter year-over-year, and EPS of only 2 cents after the charge. In addition to reducing IBM's 2014 EPS guidance of $18, Defendants entirely abandoned their goal of $20 EPS for 2015 as had been promised for years in the 2015 Roadmap, and declined to offer any revised 2015 guidance.

12.     The $4.7 billion charge—the largest charge IBM has taken in at least 20 years— and associated news that day shocked the market.  IBM common stock fell nearly $13 per share, or more than 7%, the Company's worst one-day selloff in four years.  The stock slid an additional 3.5% the next day, October 21, to a three-year low as the market continued to absorb the flurry of bad news, and has not recovered to date.

13.     In the end, IBM stock lost more than 17% of its value from its Class Period high in April 2014, causing hundreds of millions of dollars of damages to Lead Plaintiff and the Class.

## II.     JURISDICTION AND VENUE

14.     The claims asserted arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Defendant IBM maintains its principal executive offices in this District at 1 New Orchard Road, Armonk, New York 10504.  Many of the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.   Lead Plaintiff

18.     Lead Plaintiff KBC is a large institutional investment company based in Brussels, Belgium, that provides financial and investment services.  As part of KBC's asset management services, it is responsible for managing mutual funds, private funds, and institutional funds.  As of the first quarter of 2015, KBC had approximately €208 billion ($228 billion) of assets under management.

19.     KBC purchased shares of IBM common stock during the Class Period, as set forth in its certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.  By Order dated June 4, 2015, the Court appointed KBC as the Lead Plaintiff in this action.

### B.   Defendants

20.     Defendant IBM provides information technology, hardware, and services around the world.  IBM describes itself as a "company [that] creates business value for clients and solves business problems through integrated solutions that leverage information technology and

5

deep knowledge of business processes." IBM runs its operations in five business segments: (1) Global Technology Services, which primarily provides information technology ("IT") infrastructure services and business process services; (2) Global Business Services, which provides professional services and application management services; (3) Software, which consists primarily of middleware and operating systems software; (4) Systems and Technology, which provides business products requiring advanced computing power and storage capabilities through the manufacture and sale of mainframe computers, servers, storage and other hardware devices; and (5) Global Financing, which invests in financing assets, leverages with debt, and manages associated risks.

21. As of September 30, 2014, the Company had more than 989.6 million shares of common stock outstanding. IBM's common stock trades actively on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "IBM."

22. Defendant Virginia M. Rometty ("Rometty") has been President and Chief Executive Officer ("CEO") and an Executive Officer of IBM since January 1, 2012, and has been Chairman of the Board of Directors since October 1, 2012. Before Rometty was appointed to these positions, she was Senior Vice President of IBM Global Business Services, one of the Company's business segments. Rometty graduated from Northwestern University in 1979 with high honors in computer science and electrical engineering, and has worked at IBM since she joined as a systems engineer in 1981. During the Class Period, Rometty spoke to investors as part of the Company's regularly scheduled discussions relating to operating results, and signed or certified the accuracy of IBM's periodic filings with the SEC, including the Company's Form 10-K Annual Report for 2013, filed on February 25, 2014 ("2013 Form 10-K"); Form 10-Q Quarterly Report for the first quarter of 2014, filed on April 29, 2014 ("1Q14 Form 10-Q"); and

Form 10-Q Quarterly Report for the second quarter of 2014, filed on July 29, 2014 ("2Q14 Form 10-Q").

23.     Defendant Martin J. Schroeter ("Schroeter") has been Chief Financial Officer ("CFO") and a Senior Vice President of IBM, and an Executive Officer of the Company, since January 1, 2014.  Before that, Schroeter served as IBM's Treasurer, in which capacity he was "responsible for the [C]ompany's balance sheet, cash flow, capital structure, interest rate and currency risk management, and treasury operations."  During the Class Period, Schroeter spoke to investors as part of the Company's regularly scheduled discussions relating to operating results, and signed or certified the accuracy of IBM's periodic filings with the SEC, including the 2013 Form 10-K, 1Q14 Form 10-Q, and 2Q14 Form 10-Q.

24.     Defendant James J. Kavanaugh ("Kavanaugh") was the Controller and a Vice President of IBM from May 2008 through January 2015.  In January 2015, Kavanaugh became Senior Vice President for Transformation and Operations.  Before May 2008, Kavanaugh held various roles within the Company, including Vice President of Finance and Operations for IBM's Americas Group, and Assistant Controller, Finance and Planning.  In these roles, Kavanaugh was responsible for financial management and oversight across the Americas, and for IBM's financial forecast and measurements process.  During the Class Period, Kavanaugh signed or certified the accuracy of IBM's periodic filings with the SEC, including the Company's 2013 Form 10-K, 1Q14 Form 10-Q, and 2Q14 Form 10-Q.

25.     Defendants Rometty, Schroeter, and Kavanaugh are collectively referred to herein as the "Individual Defendants."  Defendant IBM and the Individual Defendants are referred to together herein as "Defendants."

C.    **Relevant Non-Parties**

26.    GlobalFoundries makes microchips for manufacturers of various consumer and enterprise-oriented electronic equipment and systems.  GlobalFoundries originally operated manufacturing facilities in Malta, New York (north of Albany); Dresden, Germany; and Singapore.  Construction of GlobalFoundries' Malta facility began in 2009, and the company started mass production of microchips there in 2012.  With the divestiture of IBM Microelectronics to GlobalFoundries, GlobalFoundries owns and operates IBM's former manufacturing plants in East Fishkill, New York (60 miles north of New York City) and Essex Junction, Vermont (near Burlington), as well as its Malta, Dresden, and Singapore plants.

27.    Confidential Witness 1 ("CW1") worked at IBM's East Fishkill, New York Microelectronics manufacturing facility from 1979 until September 2013.  From July 2005 until CW1's departure from the Company, CW1 served as a Senior Engineering Manager of Materials Analytical Services.  In this capacity, CW1 was responsible for the supervision of a group of highly skilled engineers and technicians performing analytical services in support of IBM's 300 millimeter (mm) semiconductor manufacturing facility in East Fishkill.  As a Senior Engineering Manager, CW1 was in a position to know, and does know, about the general condition, technological capabilities, and operations of the East Fishkill facility.

28.    CW2 was a Process Engineer at the East Fishkill facility from June 2013 through July 2015, and reported to Siddarth Krishnan, a Manager at IBM.  As an engineer at IBM, CW2 was in a position to know, and does know, about the general condition, technological capabilities, and operations of the East Fishkill facility.

29.    Since June 2015, CW3 has worked as a Resource Engineer for Lam Research Corporation ("Lam Research"), a semiconductor equipment manufacturing company, as a contractor within the Essex Junction, Vermont Microelectronics manufacturing facility.  In this

capacity, CW3 is a technician and trainer for the microchip production equipment used at Essex Junction.  CW3 has worked for Lam Research since October 2010, and in that capacity, has worked at several microchip manufacturing facilities throughout the world, including GlobalFoundries at its Malta location from 2010 through 2013, a French microchip company in 2014 through 2015, and now at the Essex Junction facility for GlobalFoundries since June 2015. CW3 is in a position to know, and does know, about the current condition, technological capabilities, and operations of the Essex Junction facility.

IV.     **FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS**

A.     **IBM as "Big Blue"**

30.     IBM originally became a behemoth in the computer industry by creating and dominating the mainframe computing market in the 1960s.  IBM began to enter the general consumer market in the mid-1970s.  The iconic IBM PC (Personal Computer), first sold in 1981, ignited the desktop computer revolution and introduced the "Big Blue" brand and technological prowess to the consumer public.

31.     Until the dawn of the Internet age and the widespread use of mobile devices, IBM's primary strengths were its ability to manufacture and deliver hardware computing systems, and associated internal hardware such as microchips and hard disk drives, to businesses and consumers.

B.     **Rapidly Changing Technology Demands a New Business Model**

32.     After the Internet and mobile computing emerged as the dominant technology trends beginning in the late 1990s and early 2000s, IBM slowly began to recognize that in order to remain competitive, the Company would need to overhaul its operations to meet demands less focused on its traditional offering—enterprise and home computer hardware—and more focused on mobile, data-driven and wireless solutions.

33.     The Systems and Technology business segment, which included Microelectronics, historically had been a strong cash generator for the Company.  Before the Class Period, however, IBM became unable to sustain growth within Systems and Technology, as its hardware devices have been subject to rapid "commoditization."  Commoditization means that IBM's products were becoming widely available and interchangeable with the products provided by other companies; commoditized products lack meaningful differentiation, have thin profit-margins, and are sold on the basis of price rather than brand.  Owing in large part to commoditization, while Systems and Technology generated 25% of the Company's revenues in 2006, the segment generated only 14% in 2013.

34.     IBM's once cutting-edge hardware segment eventually became a burden, as IBM hardware was rapidly becoming irrelevant to the Company's primary customer needs and was dragging down profits.  Costs of labor, changing consumer and manufacturing technology, and the costs of maintaining manufacturing facilities made IBM's business model increasingly capital intensive.  Defendants thus focused the Company's efforts on providing higher-margin software, mobile or portable computing solutions, data processing and analytics, and supporting services.

35.     IBM adopted a strategy to pursue growth and overall profits by divesting itself of its less profitable, capital-intensive hardware business units.  The Company referred to these problem units, like PCs, disk drives, printers, and certain servers, as "commoditizing businesses."

36.     On December 31, 2002, for example, IBM completed the sale of its HDD business, which manufactured computer and external hard drives, to Hitachi for $2 billion.  In 2004, IBM agreed to sell its PC division to Lenovo for $1.25 billion, making Lenovo the world's

third-largest PC business.  In June 2007, IBM sold its printing business to Ricoh for $725

million.  And on January 23, 2014, IBM agreed to sell the Company's server computer business

to Lenovo for $2.3 billion.

      **C.**     **IBM's Successful "2010 Roadmap" to Achieve $10 EPS**

     37.     In May 2007, this divestment strategy was formally introduced as part of IBM's

"2010 Roadmap," by which then-CEO Samuel Palmisano promised to deliver per-share earnings

of $10—up from $6.05 in 2006—by the end of 2010.  As the 2010 Roadmap was put into action,

IBM recognized that there was little room for future hardware growth.  Between 2006 and 2010,

the profit margins of the Company's services and software business segments grew at a rate of

4% and 7% respectively, while the hardware segment's profit margin grew a meager 1%.  By

2009, software, services, and financing comprised more than 90% of IBM's profits.  Hardware

made up less than 10% of the Company's profits that year, down from 35% in 2000.

     38.     IBM met the goal set in the 2010 Roadmap, delivering $11.52 EPS for 2010, in

substantial part by divesting itself of at least $12 billion of annual revenue from its

commoditizing businesses.

      **D.**     **IBM's Failed "2015 Roadmap" to Double EPS to $20**

     39.     On May 12, 2010, Palmisano doubled-down with the announcement of a further

strategic plan, the 2015 Roadmap.  Following-on the success of the 2010 Roadmap, IBM

promised to deliver at least $20 EPS by the end of 2015.  The push to $20 EPS was to result from

various corporate actions, including further divestitures of commoditizing businesses into 2015.

IBM slashed spending, severely restricting capital and infrastructure investment in

manufacturing assets held by the units slated for divestment—most notably Microelectronics.

     40.     Defendant Rometty had an integral role in conceiving the 2015 Roadmap when

she headed IBM Global Business Services under Palmisano, and took ownership of the strategy

when she became CEO at the start of 2012.  The 2015 Roadmap was central to IBM's overall business strategy and messaging to the investing public during the Class Period, and Rometty's lieutenants Schroeter and Kavanaugh followed her lead.  IBM routinely touted its consistent EPS growth pursuant to the Roadmap in its quarterly earnings calls during the Class Period.  In December 2014, citing this laser-like focus on meeting increasing EPS guidance, *Forbes* magazine described IBM as "a firm that has the most explicit long-term commitment to maximizing shareholder value as reflected in the stock price."

41.     Implementation of the 2015 Roadmap had a heavy negative impact on the Microelectronics business.  While the unit's revenue increased from 2009 to 2010, 2011 revenue was flat.  In 2012, as investors would learn only after the Class Period, Microelectronics posted a massive loss of $638 million, and in 2013 suffered even greater losses of $720 million.  These losses were attributable in large part to IBM's anemic hardware infrastructure spending, cut back as part of the 2015 Roadmap, and the unit's inability to keep up with advances in microchip technology or produce chips at a profit.

42.     In 2013, as the Microelectronics unit's current and projected losses continued to mount, IBM decided to sell the unit as a key move toward boosting EPS and achieving the mandate of the 2015 Roadmap.  During this time, and continuing through the Class Period, Defendants carried the Microelectronics unit's long-lived plant, property, and equipment assets on the Company's internal balance sheet at a robust value of $2.4 billion.  As Defendants alone knew or recklessly disregarded, however, Microelectronics' assets were worth nowhere near $2.4 billion, and in fact were worth essentially zero.  When the market finally learned of this, Defendants were forced to abandon the 2015 Roadmap and its $20 EPS goal amid dismal financial results.

E.    **IBM Attempts to Sell Microelectronics for Billions Before
      Agreeing to Give the Unit and $1.5 Billion to GlobalFoundries**

43.    On February 6, 2014, *The Wall Street Journal* reported that IBM was exploring the sale of its semiconductor manufacturing operations.  The report noted that chip manufacturing is a capital-intensive and "volatile" business, and that shedding those operations could help the Company's profitability and would "dovetail" with IBM's recent efforts to reduce its reliance on selling computer hardware.

44.    The *Financial Times* published a similar report the next day, February 7, stating that selling Microelectronics would be IBM's "most significant strategic move since its financial crisis in the early 1990s."  The article also noted that IBM had engaged Goldman Sachs to "sound out possible buyers" for the unit.  The article named GlobalFoundries and TSMC as the most likely buyers; these companies, along with Samsung and Intel, were "the only companies left in a field that has narrowed as the cost of building new generations of advanced fabrication plants, or 'fabs,' has risen into billions of dollars."

45.    *Bloomberg News* reported the following day, February 8, that the Company had been unsuccessfully seeking a buyer for the Microelectronics unit "since at least last year."

46.    Even after hiring Goldman Sachs to shop the unit, however, IBM was unable to find a buyer willing to pay an amount even close to the $2 billion-plus value that the Company had listed on its books.  According to an April 3, 2014 *Dow Jones* report, IBM held talks with GlobalFoundries, Intel, and TSMC, with GlobalFoundries emerging as the leading candidate.  Price was a major "sticking point" in the discussions, however.  Although IBM was asking for more than $2 billion for the Microelectronics business, prospective buyers were unwilling to pay substantially more than $1 billion, and were primarily interested in acquiring IBM's intellectual property and technology and engineering expertise rather than the chip factories.

47.     On June 11, 2014, *Bloomberg News* reported that IBM and GlobalFoundries were nearing a deal for the Microelectronics unit, and confirmed that IBM had been "searching for a buyer for the money-losing unit since last year."  The article further confirmed that GlobalFoundries was interested primarily in IBM's skilled engineering employees and intellectual property, rather than the manufacturing facilities, "which have little value as they are more than a decade old."

48.     On August 5, 2014, *Bloomberg News* reported that IBM, far from demanding $2 billion to sell the Microelectronics unit to GlobalFoundries, had offered to ***pay*** GlobalFoundries approximately $1 billion to acquire the unit.  Talks temporarily broke off in July, however, as GlobalFoundries reportedly wanted to be paid $2 billion.  The article reiterated that GlobalFoundries was primarily interested in IBM's engineers and intellectual property, and "had placed little or no value on IBM's factories because they are too old."

49.     On October 20, 2014, IBM announced that it agreed to transfer the Microelectronics business to GlobalFoundries and that it would make a $1.5 billion incentive payment to GlobalFoundries.  IBM disclosed that it would take an extraordinary, non-recurring pre-tax charge of $4.7 billion for the third quarter of 2014, which included a $2.4 billion write-down of the entire value of the Microelectronics unit's long-lived property, plant, and equipment assets, as well as $800 million in unspecified "other costs" IBM would incur.

50.     The $4.7 billion charge was the largest taken by IBM in at least 20 years and, as alleged below, crippled the Company's stock price.

**F.     IBM Microelectronics: A Brief Primer**

**1.     The Microchip Manufacturing Process**

51.     A semiconductor is a material that conducts electricity better than an insulator (like glass, which cannot conduct electricity), but less well than conductive material (like

14

copper).  Silicon is the dominant semiconductor material used to fabricate nearly all computer chips because it is low-cost and easy to combine with insulators.  Silicon forms the foundation to fabricate the transistors and electrical circuits that have enabled the microchip revolution and, ultimately, smartphones, PCs, and cloud computing.

52.     A microchip (or chip) is a tiny piece of silicon material that contains computer circuitry, principally very large numbers of transistors.  Transistors are the tiny switches embedded in a chip that control the delivery of electrical impulses in a device; it is these electrical impulses, digitized into signals of ones and zeros that tell a given device what to do.  The circuitry is printed then etched onto the chip.

53.     Microchips are often used to create microprocessors, which serve as the internal central processing unit ("CPU") of a computer or other electronic device.  There are, however, chips that are not used in the microprocessors or CPUs, such as radio frequency ("RF") chips used for wireless communications.

54.     Each microchip begins as part of a larger silicon "wafer."  Wafers are produced in a semiconductor fabrication plant (also known as a "fab" or "chip factory") by melting, refining, and shaping silica (essentially sand) into a long silicon tube, or "ingot."

55.     The pure silicon ingot is then cut into circular slices (silicon wafers) that are one-half to one millimeter thick, similar in appearance to a flat, thin dinner plate.  The size of a silicon wafer produced by a given fab is standardized, and is specified as the diameter of the wafer in millimeters.  Standard wafer sizes currently include 150mm (approximately 6 inches), 200mm (approximately 8 inches), and 300mm (approximately 12 inches).

56.     Wafers with diameters of 150mm were developed by Intel, and were first produced in commercially viable quantities in or about 1985.  In 1995, a decade later, IBM built

the first factory to produce chips on 200mm wafers in commercial volumes; this development drove the transition to chip factories using 200mm wafers as the new standard.  In or about 2002, less than ten years later, chip factories using 300mm wafers were developed for commercial production; these wafers remain the industry standard today.  The industry is currently working on developing chip factories that use 450mm.

57.     Each wafer has approximately one-half of the surface area of its larger successor. Thus, a 200mm wafer has approximately twice the surface area as a 150mm wafer, a 300mm wafer has approximately twice the surface area of a 200mm wafer, and approximately 4 times the surface area of a 150mm wafer.

58.     Because microchips are printed then etched into the silicon wafer, wafers with larger diameters, and thus more surface area, yield significantly more chips than smaller wafers. A 300mm wafer generally yields twice the number of chips as a 200mm wafer.  Thus, the number of chips a fab can produce depends on the number of "wafer starts" per month, and the size of the wafer used in the chip factory.

59.     Once the wafer has been sliced from the silicon ingot, the chips are created on the wafer by printing then etching the silicon and other deposited layers such as layers of silicon dioxide using light-sensitive chemicals (called photoresists).  When the wafer is exposed to ultra-violet light, the properties of the photoresist change and result in tiny hard and soft regions that can be etched into the silicon or insulator or conducting material.  The conductor material is copper or aluminum, which is used to connect the hundreds of millions to billions of transistors into circuits.  This process is repeated approximately 50 times, with the specific imprint (printed and etched feature) used to fabricate transistors and conducting wires.

60.     The etched transistors are microscopic and accordingly are measured in nanometers (nm).  (One thousand nanometers equal one millimeter.)  Several thousand modern transistors can fit within the diameter of a single strand of human hair.  With sizes so small, chip production demands atomic-level precision.  Foreign objects like hair or dust can easily ruin an entire chip.  Thus, microchips must be produced in "clean rooms."

61.     Clean rooms are specially designed spaces inside the chip factory, often sprawling over tens of thousands of square feet, where the environment is carefully controlled to eliminate dust or other particles from the chip-making process.  Clean rooms regulate temperature and humidity to control static electricity, and dampen floor vibration that may ruin microscopic components.

62.     Clean rooms also have highly effective air filters and air circulation systems that are capable of changing the air in the facilities up to ten times each minute.  Clean rooms are extremely costly to construct and maintain.  However, retrofitting chip fabs to accommodate new and increasingly complex manufacturing equipment is necessary because clean rooms must remain current.

63.     A microchip's "feature size," the approximate size of the transistors etched into each chip, varies by chip factory and the chip's ultimate purpose.  Chip makers use common manufacturing equipment, so the industry generally follows a common protocol for feature size.  As of 2013, modern chip foundries produced chips with feature sizes of 45nm and less.  State-of-the-art chips today have feature sizes of 14nm.  Seven nm feature size transistors are currently being developed for commercial production.

64.     In addition to stringent and costly environmental specifications, chip manufacturing machinery is extremely expensive.  For example, each clean room facility has

17

multiple tools for each distinct step in the process; the most common pieces of fab machinery range in cost from $700,000 up to $50 million each.  Some of the most modern manufacturing machinery cost up to $100 million apiece.  Considering that each fab has several hundred pieces of equipment, replacement, maintenance, and modernization of a fab's equipment is highly capital intensive.

65.    Further complicating chip production (and increasing costs), foundries must stay on the leading edge of technological development by creating smaller and smaller chips that have increasing functionality, according to a prediction known as "Moore's Law."  Moore's Law predicts that the number of transistors per square inch on a chip will double approximately every two years.  Truly revolutionary advances may require the wholesale replacement of a fab's production equipment.  As a fab's facilities and manufacturing machinery age, its ability to keep pace with technological developments withers unless significant capital investment is made each year in fab infrastructure.

66.    This is apparent when looking at historical costs of fab construction.  In 2000, for example, IBM announced its largest capital investment to date, including $2.5 billion for a gut renovation of the East Fishkill fab.  In contrast, Samsung announced in May 2015 that its newest fab, to be built in South Korea and scheduled to begin production in 2017, will cost approximately $14.7 billion.

### 2.    Scale Is the Key to Profitable Chip-Making— And IBM Lacked Scale Entirely

67.    The costs of constructing, maintaining, and updating fabs are very high, but the costs can be offset by the increased production volume that results from a combination of factors, including Moore's Law (more transistors per square inch) and historically increasing wafer sizes (more chips per wafer).  Economies of scale are thus essential to the profitability of chip-making.

68.     Wafer size and feature size each have a direct bearing on the production scale at a given plant, as each has a significant impact on how many chips a fab's wafers will yield.  For example, consistent with industry trends, because a 200mm wafer has approximately one-half of the surface area of a 300mm wafer, a fab with 30,000 wafer starts per month from a 200mm wafer will yield approximately one-fourth the number of chips (of the same feature size) as would a fab with 60,000 wafer starts per month from a 300mm wafer.

69.     Similarly, all else being equal, a chip with a 45nm feature size would be approximately one-fourth the size of chip with a 90nm feature size.  Thus, a 45nm facility using 200mm wafers would produce approximately four times as many chips (at the same number of wafer starts per month) as would a 90nm facility using 200mm wafers.

70.     Because a fab's wafer size and feature size, each of which are determined by the technical capabilities of its production equipment, relate directly to its ultimate production capacity, outmoded fab equipment (using smaller wafers or larger features) can have an enormous impact on volume.

71.     Finally, plant capacity (often measured in "wafer-starts" per month), is both a function of plant size and an indication of the plant's efficiency of operations.  Most modern foundries have a capacity of approximately 60,000 wafer-starts per month.

72.     In an industry with such excessive costs of production, a fab's ability to produce the greatest number of chips at the lowest possible price provides a significant competitive advantage.  Thus, producing chips at the greatest possible scale is a precursor to market competitiveness.

73.     The Microelectronics unit's chip factories had no scale.  Defendant Schroeter, in explaining the GlobalFoundries deal during a November 11, 2014 IBM Investor Forum, admitted

that Microelectronics had been a "subscale manufacturer" that "just [could not] get the

economics to work out":

> Now, we get to the divestiture of our semiconductor manufacturing
> operations and I think from my perspective, this was vital for us to
> remain committed to that high performance platform as opposed to
> an indication that we wanted to get away from it. ***The fact is we
> are—we were—we are a subscale manufacturer in
> semiconductors*** and when we look at where the technology is
> going, we'll get to 10 nanometer, 7 nanometer. At some point
> then, you'll change the size of the wafer. ***These are billions and
> billions and billions of investments needed. And when you're
> subscale, you just can't get the economics to work out***.
>
> So now, we've got a supplier in GlobalFoundries who has the
> scale. So the way that everyone should interpret that divestiture of
> semiconductor manufacturing is it reflects our desire to stay in and
> remain committed to high performance computing, as opposed to
> something else. We have said—we've been very public about
> we'll still do the research. We'll still do the development on the
> technology side, but ***we're not going to manufacture it again
> because we don't have the scale***.[1]

### 3.    The Global Market for Microchips in 2013 Favored Chips IBM Did Not Make

74.    In 2013, the demand and distribution channels for microchips were highly

diverse. Three primary markets and distribution channels for microchips included

mobile/smartphone and tablet CPUs, PC CPUs, and mainframe/high-end server CPUs. Each

market varies greatly in size when compared with one another. But in 2013, the largest market

by volume for chips was the mobile/smartphone and tablet CPU market, followed by the PC

CPU market. Of the three, mainframe/high-end server CPUs saw the least demand in 2013.

75.    In the mobile/smartphone market, two of the best-selling products are the Apple

iPhone and Samsung's Galaxy phones. As of the end of 2013, global smartphone sales nearly

topped one billion units. At the time, the iPhone 5S included the A7 processor, which used a

---

[1] Throughout this Complaint, emphases in quotations are added unless otherwise noted.

28nm feature size.  Chips made for Apple are made in fabs owned by TSMC or Samsung; chips used in Samsung's smartphones are manufactured by Samsung itself or by TSMC.  As of the end of 2013, and thereafter, IBM did not make CPU chips for the mobile/smartphone and tablet markets.

76.      In the PC market, the best-selling products are Microsoft Windows-based PCs and Apple's MacBook computers.  Approximately 300 million PCs were sold in 2013.  The CPU chips found in PCs were fabricated primarily in plants owned by Intel; a smaller number of PC CPU chips were fabricated by GlobalFoundries.  Intel's most advanced chips contain several billion transistors on each chip, and have a 14nm feature size.  IBM did not make CPU chips for PCs.

77.      In the mainframe/high-end server market, the best-selling products are (1) Intel-based x86 servers that are used by companies such as Google, Facebook, and Amazon (produced by numerous different manufacturers), and (2) IBM's System z mainframe line used by banks and other large business enterprises.  IBM has been in the mainframe chip business for more than fifty years.  IBM's POWER 8 chip is the CPU currently found in its System z mainframes, with a feature size of 22nm.  These chips were produced at IBM's East Fishkill facility.

### G.      The East Fishkill Fab Was Obsolete

78.      In or about 2005, IBM began making microchips at East Fishkill for use in the Company's large, mainframe computer servers.  These chips were highly specialized to IBM's particular needs, and the process flow by which IBM produced these chips in East Fishkill was uniquely designed to meet IBM's specifications (as opposed to broader market-wide specifications).  IBM's mainframe CPU chip production flows are significantly different from those used in producing chips for PCs or mobile devices.

21

79.     Since at least 2010, IBM has systematically failed to update the East Fishkill facility and its manufacturing equipment sufficiently to produce the increasingly complex products integral to modern and next-generation computing devices.  For example, the ceilings of the East Fishkill facility are at least one meter lower than the factory specifications for manufacturing next-generation microchips.  Also, the floor load capacity of that facility is lower, meaning that the facility cannot support the weight of chip manufacturing tools necessary to produce next-generation microchips.  As noted in an article titled "This Old Cleanroom," posted on *Solid State Technology: Insights for Electronics Manufacturing*, an industry website, commenting on IBM's retrofitting of the East Fishkill facility in 2001:

> [T]he switch to a 300mm line [from a smaller wafer size] meant that the ceiling height within the cleanroom had to move from 10 to 14 feet.  The larger size of equipment, combined with the need for automated overhead transport of wafers, lead to this increase.  That, in turn, meant the company couldn't simply slap up new walls and wheel equipment in.  The building had to undergo what amounted to an extensive construction job.

80.     Additional measures are necessary to buttress floors and building foundations to withstand increased weight of more technologically advanced manufacturing equipment.  Retrofitting the East Fishkill facility in 2013 would have cost IBM several billion dollars for construction and production machinery.

81.     In addition to its technological obsolescence, the East Fishkill facility is significantly less efficient than other fabs because Defendants have not invested in increasing the clean room size.  On a monthly basis, the East Fishkill plant can manufacture approximately 14,000 wafer-starts.  By way of comparison, while many modern, efficient chip factories can begin manufacture of up to 60,000 wafers per month, East Fishkill's capacity was last considered modern, or up-to-date, in 2005.  This limited capacity, unchanged since East Fishkill's reopening

(following its retrofitting), increases per-chip production costs, thus reducing profit margins, when compared with other microchip fabs.

82.     Even at this lower capacity of 14,000 chip starts per month, IBM has operated East Fishkill at less-than-full capacity since at least 2011 because of a precipitous reduction in demand for IBM servers.  Between 2008 and 2013, annual revenue from POWER system sales declined from $7.2 billion to $3.9 billion.

83.     According to CW1, beginning around 2010 or 2011, it became apparent that IBM no longer wanted to sustain Microelectronics because manufacturing microchips was simply too costly.  CW1 also noted that, as Microelectronics continued to lose more and more business and money after 2010, IBM stopped investing in updating the East Fishkill facility's manufacturing equipment, and the Company did not keep up with the unit's mission to maintain state of the art technology and produce state of the art microchips.  Further, according to CW1, the technology at the facility was aging and IBM did not make the infrastructure investments necessary for the unit to remain state of the art.

84.     Other employees also observed the degradation of the East Fishkill facility. According to CW2, "things were going downhill" when CW2 started.  Among CW2's immediate observations was the significant number of employees that were leaving IBM, either voluntarily or through layoffs.  CW2 noted that engineers, many with 10-20 years of experience in microchips, were being replaced by recent college graduates, and that in August 2013, all of the employees within CW2's group were furloughed for one week without pay.

85.     Further, according to CW2, although there were times when equipment was replaced by IBM, any replacement required a "business critical" justification.  In fact, according to CW2, things got so bad that, before the announcement of the sale to GlobalFoundries,

23

engineers at East Fishkill assumed that the Company would just shutter the facility because it was so old and had outlived (or was nearing the end of) its useful life.

### H.   The Essex Junction Fab Was Obsolete

86.   As of 2013, the Essex Junction fab produced several types of non-CPU chips. These non-CPU chips were integral to many products made by other manufacturers ("Original Equipment Manufacturers" or "OEMs").  In a smartphone, for example, there are RF chips used in the cellular part as opposed to the computer processing part of the phone.  RF chips sell for 100 to 1,000 times less than CPU chips for mobile/smartphones and tablets, PCs, and mainframe/high-end servers, because RF chips require fewer engineering resources to develop, and competition is intense, especially from manufacturers in Asia.

87.   Even though RF chips are less technologically advanced than CPU chips, since approximately 2011 the Essex Junction fab has only been capable of approximately 40,000 wafer-starts per month (of 200mm wafers), compared with 60,000 wafer starts of 300mm wafers found at GlobalFoundries' modern, up-to-date fabs in Malta, New York, and Dresden, Germany, and 93,000 wafer starts of 200mm wafers at GlobalFoundries' Singapore facility.  Additionally, the Essex Junction facility is only capable of manufacturing chips with transistors down to 90nm in size.

88.   Given that IBM's customers pay significantly less for these RF chips than CPU chips, and that IBM is unable to produce RF chips at Essex Junction at anything close to a profitable scale, this facility was not sustainable for Defendants' long-term strategy.  The facility was not technically capable of producing chips at a profit for IBM as of December 31, 2013.

89.   There were further troubles at Essex Junction that would have been readily apparent to any IBM employee knowledgeable about chip manufacturing.  Tools at the Essex Junction facility can only process 200mm wafers, with approximately half of the surface area of

a 300mm wafer (the current industry standard).  To update this plant to produce the more cost-efficient 300mm wafers, the Company would have needed to invest billions in the facility.

90.    CW3 is a contractor whose job it is to install, service, and train employees on the proper use of microchip production equipment.  According to CW3, the equipment at the Essex Junction fab was generally well-maintained, but is approximately 20 years older than equipment used by modern chip fabs including GlobalFoundries' Malta facility.  According to CW3, 20-year-old equipment would be considered extremely outdated in the semiconductor industry, but since the Essex Junction facility is kept clean, visitors who did not know better might not understand just how old the equipment was.  According to CW3, it would be very costly to convert the Essex Junction fab to allow it to produce 300mm wafers; probably more than $6 billion or $7 billion.

91.    Further, CW3 was told by employers at the fab that some of the Essex Junction facility's equipment had been idled because the plant has not been operating at full capacity due to decreased demand.  According to CW3, idling this equipment saves maintenance costs and is done when there is insufficient demand.

92.    As a result of IBM's inability to produce chips at a profitable scale, it would eventually be disclosed that Microelectronics' OEM revenue (derived from chips produced in the Essex Junction fab) was experiencing a significant downward trend from 2011 to 2013 that gave no indication of improving in 2014.  Specifically, OEM revenue was $1.975 billion in 2011, $1.572 billion in 2012 (down 21.4%), and $1.436 billion in 2013 (down 6.9%).  After announcing the deal with GlobalFoundries, IBM singled out Microelectronics (as opposed to Software or Servicing) as the business unit that drove down overall revenue of the Company's OEM business in both 2012 and 2013.

## V.   DEFENDANTS KNOWINGLY OR RECKLESSLY VIOLATED GAAP WITH RESPECT TO THE CARRYING VALUE OF MICROELECTRONICS' LONG-LIVED ASSETS

### A.   GAAP Rules on Asset Recoverability Testing

93.     GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes or other disclosures.  Regulation S-X requires that interim financial statements must also comply with GAAP, but need not include disclosures that would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210.10-01(a).

94.     GAAP requires a company to recognize an impairment loss when certain conditions are met.  According to GAAP, "[a]n impairment loss shall be recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value. The carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group)."  Accounting Standards Codification ("ASC") 360-10-35-17.

95.     Further, "[t]hat assessment shall be based on the carrying amount of the asset (asset group) at the date it is tested for recoverability, whether in use [ASC 360-10-35-33] or under development [ASC 360-10-35-34].  An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value."  ASC 360-10-35-17.

96.     ASC 360-10-35, *Property, Plant, and Equipment: Subsequent measurement*, provides that a long-term asset "shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable." ASC 360-10-35-21.

97.     The purpose of such test is to determine whether the carrying amount of a given asset is recoverable from the cash flows generated by the asset over its remaining useful life. The "carrying amount" of a long-lived asset or asset group, such as the assets of the Microelectronics unit, is the amount at which an asset (or asset group) is recognized in the financial statements of an entity after deducting any accumulated depreciation and any accumulated impairment losses. When an asset is deemed impaired, GAAP requires that a loss be recorded to recognize a decrease in value. Defendants represented throughout the Class Period that the Company's financial statements complied with GAAP in this regard.

98.     Four factors (among others) specify events or changes in circumstances that require an entity to test an asset's carrying amount for recoverability:

> (a) a significant decrease in the market price of a long-lived asset (asset group);
>
> (b) a significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition;
>
> (c) a current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group); and

(d) a current expectation that, more likely than not, a long-lived asset

(asset group) will be sold or otherwise disposed of significantly

before the end of its previously estimated useful life.

ASC 360-10-35-21.

99.     With respect to subpart (d) above, the term "more likely than not" refers to a level of likelihood that is more than 50%.  ASC 360-10-35-21.

100.     For long-lived assets classified as held and used in operations (such as the assets held by Microelectronics), the recoverability test and subsequent write-down in the value of the long-lived asset, if found to be impaired, is a two-step process:

(a) Step One—Compare the carrying amount of the long-lived asset to

its expected undiscounted cash flows generated over its useful life.

(b) Step Two—If the carrying amount is greater than the aggregate

undiscounted cash flows, the entity shall recognize an impairment

loss equal to the difference between the asset's carrying amount

and its fair value.

101.     The undiscounted cash flows expected to result from the use and eventual disposition of the long-lived asset being tested are a measure of the future benefit that the owner of the asset can expect to enjoy through ownership of the asset over its useful life.  The term "undiscounted" refers to the fact that such cash flows are not adjusted downward for the time-value of money or for risk.  Further, the cash flow estimates used in this analysis must also be consistent with other company estimates, such as internal budgets and projections.

102.     GAAP defines "fair value" as "the price that would be received to sell an asset or paid to transfer a liability in an *orderly transaction* between *market participants* at the

measurement date." ASC 820-10-20, *Glossary* (emphases in original). GAAP further specifies that fair value is a market-based rather than an entity-specific measurement. Thus, Defendants, in stating that IBM followed GAAP guidance with respect to recoverability testing of Microelectronics' long-lived assets, knew that if Microelectronics' assets were not recoverable, they were required to value those assets on IBM's financial statements at their fair value on an open market, not at their historic carrying amount in IBM's accounting records.

**B.      Defendants Knew or Recklessly Disregarded
That Microelectronics' Assets Were Impaired**

**1.      Defendants Knew or Recklessly Disregarded That IBM
Intended to Sell the Microelectronics Unit Before 2014**

103.    Defendants, as alleged above, began to seek a buyer for the Microelectronics unit in 2013, and retained Goldman Sachs to assist its efforts no later than early February 2014. IBM filed its 2013 Form 10-K on February 25, 2014. The Company was required to evaluate subsequent events through the date its financial results were reported. *See* ASC 855-10-25-1A, *Subsequent Events: Recognition*. If the subsequent event, here the retention of Goldman Sachs, provided evidence about conditions that existed at the balance sheet date (December 31, 2013), then Defendants were required to incorporate the effects of those conditions into its reported financial results. *See* ASC 855-10-25-1.

104.    IBM's retention of Goldman Sachs, combined with the fact that IBM began to seek a buyer in 2013 and had declared a formal strategy years earlier to divest unprofitable commoditizing businesses, establishes that the Company intended to sell Microelectronics before 2014. Discussions regarding the retention of a major investment bank to advise on the sale of a $2.4 billion set of assets that was key to IBM's 2015 Roadmap strategy, necessarily began before 2014.

105.    Defendants thus knew no later than December 31, 2013 that it was "more likely than not" that the Company would divest the Microelectronics unit before the expiration of the unit's assets' useful life.  Nonetheless, Defendants failed to order asset recoverability testing under GAAP, which would have shown that the unit's long-lived assets were impaired.  Had Defendants ordered recoverability testing, IBM would have been required to record and disclose the resulting material impairment loss on IBM's financial statements for fourth quarter and fiscal year 2013.

### 2.    Microelectronics' Heavy and Consistent Losses Establish That IBM Violated GAAP

106.    After the Class Period, Defendants finally disclosed the actual negative pull Microelectronics had been having on the Company's financial performance for years, and which Defendants projected would continue.  IBM disclosed that Microelectronics had losses of $638 million, $720 million, and $619 million in 2012, 2013, and the first three quarters of 2014, respectively.

107.    These losses occurred on shrinking revenue, which decreased 15.2% from 2012 to 2013, and an additional 3.5% from 2013 to 2014.  Although these numbers were not public during the Class Period, Defendants were able to, and in fact did, measure such losses contemporaneously.  Defendants thus knew, no later than December 31, 2013, that the unit had lost more than $1.3 billion over the course of the previous two years, and would have had the ability to estimate, no later than December 31, 2013, that the unit would incur similar projected losses in 2014 with reasonable accuracy and certainty.

### 3. Defendants Knew or Recklessly Disregarded That Microelectronics' Asset Carrying Value Was Significantly Overstated

108.     As alleged above, IBM's fabs were of little value no later than December 31, 2013.  The chips produced at Essex Junction were cheap and ancient by 2013 standards.  Even to the extent the facility had a purpose useful to IBM's strategic business plans, it had little prospect of producing the technologically advanced chips that were priced high enough and at a volume sufficient to produce a profit.  The transistor sizes in the chips produced in Essex Junction were last considered advanced at least 10 years ago.

109.     Further, the chips made at East Fishkill were money-losers for IBM because they were only used in the Company's proprietary servers that generally cost upwards of $250,000.  Because demand for these servers had dried up around 2013, as acknowledged in IBM's own discussion of its 2013 results, the East Fishkill facility was not operating at full capacity.

110.     For chip plants, manufacturing costs are such that a profit can only be made when chips are produced at the greatest possible scale, making less than fully utilized fabs a significant drain on profits.  Against this backdrop, Defendants knew or recklessly disregarded that on the open market, the fair value of Microelectronics' long-lived assets was materially lower than the recorded carrying value of $2.4 billion.

111.     There are four key chip production metrics that any knowledgeable industry executive would necessarily take into account when determining the fair value of a chip plant:

> (a) the facility's total wafer production capacity (discussed herein in wafer-starts per month);
>
> (b) wafer size;
>
> (c) transistor feature size; and

(d) plant construction and ability to adopt future, next-generation chip

production tools.

112.     Metrics (a) through (c) above relate directly to the cost and efficiencies of

producing chips at a given fab.  As such, it is these factors that primarily govern the volume of

chips a given plant can produce in a month.

113.     Because these are the primary determining factors relating to a plant's efficiency,

deficiencies in any one (or several) of factors (a) through (c) would significantly degrade the

value of such a facility.  Anything less than full maximization of any of those factors would

make it difficult for that facility to produce chips at the scale and efficiency necessary to

maintain a profit.

114.     Further, although IBM reportedly sought $2 billion for the Microelectronics

assets, no buyer was willing to offer substantially more than $1 billion, and when IBM

subsequently offered GlobalFoundries $1 billion to take the unit, GlobalFoundries was

demanding $2 billion.  And GlobalFoundries was primarily interested in acquiring IBM's

engineers and intellectual property rather than manufacturing facilities, which reportedly "ha[d]

little value as they were more than a decade old."

115.     Thus, no one offered to pay IBM even half of the Company's $2.4 billion carrying

value of the assets, and indeed GlobalFoundries demanded to be paid an amount approaching

that carrying value to take the unit.

C.     **IBM Improperly Delayed Recognition of an**
       **Impairment Charge Until the Sale to GlobalFoundries**

116.     As alleged above, every indicator relating to the value of Microelectronics' long-

lived assets pointed towards impairment.  No later than December 31, 2013, IBM had strong

corroborative evidence of multiple "changes of circumstances" affecting Microelectronics, any of which independently would have required the Company to test for asset recoverability.

117.    Considering the historic, current-period, and projected losses suffered by Microelectronics, and its demonstrable decrease in market value, the first step in GAAP guidance governing recoverability would certainly have shown that the carrying amount of the unit's assets was significantly greater than the expected undiscounted cash flows generated over the unit's projected remaining useful life.  Indeed, these circumstances would have indicated to Defendants that the unit's assets had essentially no value.

118.    Similarly, an estimate of the fair value of Microelectronics' long-lived assets as of December 31, 2013, would have yielded a value significantly below the unit's recorded carrying amount (*i.e.*, step two in the GAAP guidance).  As a result, IBM was required, no later than December 31, 2013, to record the difference between Microelectronics' long-lived assets' estimated fair value and the carrying amount of the unit as an impairment loss on its income statement, incurring a charge that should have been reported in its fourth quarter and 2013 Annual financial statements.

119.    There is no evidence of any material adverse change to Microelectronics or its assets that arose after December 31, 2013, but before September 30, 2014, that would have otherwise caused the magnitude of the $4.7 billion charge at that time.  Thus, IBM's oversight or misuse of its available data was an "accounting error" pursuant to GAAP, which was material, and which, as described below, should have resulted in a release of restatements of all of IBM's financial statements filed with the SEC after December 31, 2013, including the financial statements reported in IBM's 2013 Form 10-K.

**D.      IBM's Financial Statements Concealed the Impairment
and Lack of Value of the Microelectronics Assets**

120.      ASC 250-10-S99, *Accounting Changes and Error Corrections: SEC Materials,*
provides GAAP guidance related to the evaluation of financial statement materiality for
accounting purposes.  This provision requires materiality judgments to be based on both
quantitative and qualitative considerations.

121.      This provision also states that "Among the considerations that may well render
material a quantitatively small misstatement of a financial statement item are":

- "whether the misstatement hides a failure to meet analysts'
  consensus expectations for the enterprise" [Qualitative Materiality
  Factor 1];

- "whether the misstatement masks a change in earnings or other
  trends" [Qualitative Materiality Factor 2]

- "when management or the independent auditor expects (based, for
  example, on a pattern of market performance) that a known
  misstatement may result in a significant positive or negative
  market reaction, that expected reaction should be taken into
  account when considering whether a misstatement is material"
  [Qualitative Materiality Factor 3].

122.      Pursuant to these principles, the misstatement of IBM's financial statements
caused by its failure to recognize the impairment of Microelectronics' assets was both
quantitatively and qualitatively material.

34

### 1.     Estimate of IBM's Restated EPS and Net Income

123.    Table 1 below provides estimates of IBM's restated diluted earnings per share for each period from the fourth quarter of 2013 through the third quarter of 2014, had IBM recognized the impairment of Microelectronics' long-lived assets as of the end of those periods:[2]

| | a | b | c | d = b - c | e = c * a | f = e / a | g = d - f | h = f / d |
|---|---|---|---|---|---|---|---|---|
| Period | Weighted-Average Shares Outstanding Used to Calculate Diluted EPS | Diluted EPS from Continuing Operations | Diluted EPS from Discontinued Operations | Diluted EPS | Q3 2014 Loss from Discontinued Operations (Microelectronics Business) ($ millions) | Q3 2014 Loss from Discontinued Operation per Share | Estimate of Restated Diluted EPS | Percentage Change |
| Q4 2013 | 1,103,042,156 | $ 5.76 | $ (0.03) | $ 5.73 | | $ (3.11) | $ 2.62 | -54% |
| FY 2013 | 1,103,042,156 | $ 15.30 | $ (0.36) | $ 14.94 | | $ (3.11) | $ 11.83 | -21% |
| Q1 2014 | 1,041,770,149 | $ 2.43 | $ (0.14) | $ 2.29 | | $ (3.29) | $ (1.00) | -144% |
| Q2 2014 | 1,005,148,295 | $ 4.23 | $ (0.11) | $ 4.12 | | $ (3.41) | $ 0.71 | -83% |
| Q3 2014 | 997,657,878 | $ 3.46 | $ (3.44) | $ 0.02 | $ (3,432) | | | |

124.    Table 2 below provides estimates of IBM's restated net income for each period from the fourth quarter of 2013 through the third quarter of 2014, had IBM recognized the impairment of Microelectronics long-lived assets as of the end of those period ends:

| | a | b | c = a + b | d = b / a |
|---|---|---|---|---|
| Period | Net Income | Q3 2014 Loss from Discontinued Operations (Microelectronics Business) ($ millions, after tax) | Estimate of Restated Net Income | Percentage Change |
| Q4 2013 | $ 6,185 | | $ 2,753 | -55% |
| FY 2013 | $ 16,483 | | $ 13,051 | -21% |
| Q1 2014 | $ 2,384 | | $ (1,048) | -144% |
| Q2 2014 | $ 4,137 | | $ 705 | -83% |
| Q3 2014 | $ 18 | $ (3,432) | | |

[2] On September 30, 2014, IBM reclassified the Microelectronics business as Held for Sale. The financial results of the Microelectronics business were henceforth reported as discontinued operations. *See* Notes to Financial Statements in 2014 Form 10-K, at 22 and 43; *see also* 2013 Form 10-K, at 123; 1Q14 Form 10-Q, at 69; 2Q14 Form 10-Q, at 88; 3Q14 Form 10-Q, at 91; 2014 Form 10-K, at 152.

**2.    The Misstatements of IBM's Financial Results for
Year-End 2013 and Subsequent Quarters Were Material**

125.    Tables 1 and 2 above demonstrate that IBM's failure to recognize the impairment of Microelectronics' assets by December 31, 2013, would have caused misstatements of significant magnitude in its financial statements for fiscal periods leading up to the third quarter of 2014 if an equivalent charge had been recorded in any of those periods.  The magnitude of IBM's misstatements is clear—had IBM disclosed the true value of the Microelectronics' assets, its reported EPS would have been *reduced* by 55% for fourth quarter 2013, 144% for first quarter 2014, and 83% for second quarter 2014.

126.    Given the effect of such misstatements, without consideration of any qualitative factors, it is apparent that they had a significant and material effect on investors and others reviewing IBM's financial statements.  The misstatements contained in IBM's financial reports were thus material.

**3.    Qualitative Factors Further Demonstrate
the Materiality of IBM's Misstatements**

127.    Table 3 below shows that between December 31, 2013 and September 30, 2014, IBM met or beat analyst consensus expectations by a very small margin:

| Period | Announced Non-GAAP EPS | Non-GAAP Consensus Analyst EPS Estimate | Percentage Above Consensus Analyst EPS Estimate |
|---|---|---|---|
| Q4 2013 | $    6.13 | $    6.00 | 2.2% |
| FY 2013 | $   16.99 | $   16.81 | 1.1% |
| Q1 2014 | $    2.54 | $    2.54 | 0.0% |
| Q2 2014 | $    4.32 | $    4.31 | 0.2% |

128.    Had IBM corrected its misstatements in any of the above reporting periods, as it should have, it would have caused the Company to miss consensus analyst estimates.  This is an indication of materiality under Qualitative Materiality Factor 1.

36

129.     Further, as is clear from IBM's restated EPS guidance, and the abandonment of the Company's prominent 2015 Roadmap goal of $20 EPS, each of which were only revealed at the announcement of the sale, the misstatements alleged herein were material, as they operated to "mask a change in earnings or other trends" under Qualitative Materiality Factor 2.

130.     It is also apparent that, under Qualitative Factor 3, the sheer magnitude of the concealed impairment loss is sufficient to conclude that its disclosure would have caused a significant negative market reaction, thus making such misstatements material.

131.     Accordingly, both quantitatively and qualitatively, IBM's failure to recognize the impairment of Microelectronics' assets by December 31, 2013, caused its Form 10-K for the year ended December 31, 2013, to be materially misstated.  Similarly, if IBM had recorded the impairment charge in either of its Forms 10-Q for the quarters ended March 31 and June 30, 2014, the financial statements would have been materially impacted.

## VI.    THE TRUTH EMERGES

### A.    Defendants Announce the Divestment of the Microelectronics Business and its Impact on the Company's Financial Results

132.     At approximately 7:00 a.m. on October 20, 2014, IBM and GlobalFoundries issued a press release jointly announcing that they had entered into a Definitive Agreement under which GlobalFoundries would acquire IBM's global commercial semiconductor technology, "including intellectual property, world class technologists and technologies related to IBM Microelectronics" for cash consideration of $1.5 billion to be paid to GlobalFoundries by IBM. The payment would be made over three years and adjusted for $200 million in working capital. The deal included an agreement whereby GlobalFoundries would continue to supply semiconductors to IBM for the Company's server products.

133.    The press release also announced that "IBM will reflect a pre-tax charge of $4.7 billion in its financial results for the third quarter of 2014, which includes asset impairment, estimated costs to sell the IBM microelectronics business and cash consideration to GlobalFoundries."  The extraordinary $4.7 billion charge—the largest taken by the Company in at least 20 years—included the total, $2.4 billion write-down of the Microelectronics unit's long-lived assets.  IBM filed the press release with the SEC on Form 8-K the same day.

134.    Also on October 20, 2014, IBM issued a press release (filed with the SEC on Form 8-K the same day) announcing disappointing financial results for the third quarter ended September 30, 2014, reporting sales of $22.4 billion on continuing operations (excluding Microelectronics), down 4% from the third quarter of 2013, and operating profits of $3.68 per share, down 10% from the third quarter of 2013 and sharply below analysts' consensus expectation of $4.31.

135.    As a result of this charge, IBM's net profit for its third quarter of 2014 declined 99.6% year-over-year—falling from $4.04 billion in third quarter 2013 to just $18 million in third quarter 2014.  EPS for the quarter was only $0.02 after the charge.

136.    IBM also reported that its gross profit margin from continuing operations on an operating basis was 49.2%, down 90 basis points from the third quarter of 2013.  Total revenue from IBM's Systems and Technology Group, which included semiconductor operations, declined 15%.

137.    The press release quoted Defendant Rometty as stating that "[w]e are disappointed in our performance."

138.    The press release also stated the following regarding discontinued operations:

> The loss from discontinued operations in the third quarter includes a non-recurring pre-tax charge of $4.7 billion, or $3.3 billion, net

of tax.  The charge includes an impairment to reflect fair value less estimated costs to sell the Microelectronics business assets, which the company has classified as held for sale at September 30, 2014. The charge also includes other estimated costs related to the transaction, including cash consideration expected to be transferred to GLOBALFOUNDRIES of approximately $1.5 billion.  The cash consideration is expected to be paid to GLOBALFOUNDRIES over the next three years and will be adjusted by the amount of the working capital due by GLOBALFOUNDRIES to IBM, estimated to be $0.2 billion.  In addition, discontinued operations includes operational net losses from the Microelectronics business of $0.1 billion in both the third quarter of 2014 and the third quarter of 2013.

139.    At 8:00 a.m. on October 20, 2014, IBM held its third quarter earnings call (the ("3Q14 Earnings Call").  Prepared remarks for this call were filed with the SEC on Form 8-K the same day.  Defendant Rometty, who generally did not participate in quarterly earnings calls, was on the 3Q14 Earnings Call together with Defendant Schroeter.

140.    During the 3Q14 Earnings Call, Schroeter stated the following regarding Microelectronics:

> [T]he 2013 OEM revenue associated with the divested business was $1.4 billion, and *our STG segment included pre-tax losses for this business of over $700 million.*  This is being reported as a discontinued operation.  In the third quarter, [discontinued operations] will include both losses from the ongoing operations of about $90 million after tax, and a one-time after-tax charge of $3.3 billion associated with the transaction.

141.    Defendant Schroeter also reduced 2014 guidance during the call, abandoning the Company's longstanding 2015 EPS guidance of $20 and acknowledging that rather than $18 EPS for 2014 as promised in July, "full year 2014 Operating EPS [would] be down between 2 percent and 4 percent, that's off last year's comparable base of $16.64."  Equally surprising, IBM declined to offer any revised guidance for 2015 EPS until after the Company released its full-year 2014 results in early 2015.  (Ultimately, Schroeter announced projected full-year 2015 EPS of only $15.75-$16.50, which was again below analysts' expectations.)

142.     Analysts were stunned by the news.  Goldman Sachs observed, "[o]bviously there's a lot of new info here," and a Barclays analyst commented, "[w]e've just had obviously a major setback here."

143.     A Sanford Bernstein analyst asked Rometty: "[D]o you view the current results as effectively a crisis at IBM and how do you gauge this magnitude of disappointment?"  She replied:  "There is no doubt, look in this quarter, and part of the reason I'm on the call, *obviously we were disappointed in this quarter* . . . ."

144.     Cantor Fitzgerald queried regarding the newly released details on Microelectronics' losses:  "I just wanted to be clear.  What did the chip business lose in 2013 and what are the expectations for loss in 2014?"  Schroeter responded: "In 2013 we had a loss of $700 million on a pretax basis.  And 2014 is basically flat to what we saw in 2013."

145.     Concluding the 3Q14 Earnings Call, Rometty characterized IBM's "divestiture of the [Microelectronics] business" as an "important strategic move and very important to us."  She linked the divestiture with the Company's retraction of the 2015 $20 EPS goal in the 2015 Roadmap:

> Okay?  So, look, let me—I think it's probably a good time for me to wrap up here and I'd like to make a couple comments.
>
> The first I'd like to just really summarize for everyone why I thought it was important to join the call today.  As many of you referenced in your comments, we had *two strategically important announcements* that we made.
>
> *One was this divestiture of the microelectronics business.  It's an important strategic move and very important to us.*  Martin [Schroeter] just commented about some of the financials around it, but it is more than that.  It is about strategy.
>
> *The second is, and the second important reason I wanted to join, is we no longer expect to deliver that 2015 EPS objective which we have talked about and as you know, it has been in place for some time.  But these two things do come together[.]*

**B.** **Reaction to IBM's Announcement**

**1.** **Stock Price Reaction**

146.   As reflected in the chart below, the market was shocked by the flurry of the October 20, 2014 news as it absorbed the severity of the charge IBM had taken at the announcement of the divestment, the Company's related earnings miss, and the abandonment of its previous earnings guidance in its now-defunct 2015 Roadmap.

147.   In reaction to the news, the price of IBM common stock dropped by 7.11%, from $182.05 per share at the close of trading on October 17, 2014, to $169.10 per share at the close of trading on October 20, 2014, the next trading day.  Trading volume for the stock on October 20, 2014 was 23,416,511 shares, more than six times higher than average daily volume of 3.46 million shares during the preceding 30 trading days, and more than five times the average daily volume of 4.21 million shares during the Class Period.  The stock price decline was IBM's worst one-day selloff in four years, and brought the stock down to a three-year low.  The price decline was statistically significant and caused economic injury to Lead Plaintiff and other members of the Class.

148.   The market continued to react to the corrective disclosures the next day.  On October 21, 2014, the price of IBM's common stock continued to slide, dropping an additional 3.47%, from $169.10 at the close of trading on October 20, 2014, to $163.23 (another three-year low) at the close of trading on October 21, 2014.  Trading volume for the stock on October 21, 2014, was 20,953,605 shares, more than six times higher than average daily volume during the preceding 30 trading days, and more than four times the average daily volume of 4.21 million shares during the Class Period.  This price decline was statistically significant and caused economic injury to Lead Plaintiff and other members of the Class.



149.    The October 20, 2014 stock price decline massively reduced the Company's market capitalization, wiping out $30.49 billion in overall shareholder value from the start of the Class Period and $38.54 billion from the Class Period high on April 14, 2014.  The October 21, 2014 stock price decline erased an additional $5.81 billion in market capitalization, down $36.3 billion from the start of the Class Period and $44.35 billion from the Class Period high on April 14, 2014.

150.    In the end, IBM stock declined more than 17% from its Class Period high close of $197.77 on April 14, 2014, and has not recovered to date.  On August 3, 2015, the date this Complaint was filed, IBM common stock closed at $158.71.

151.    The losses suffered by Lead Plaintiff and other members of the Class as a result of the corrective disclosures alleged were not caused solely by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants'

fraudulent conduct.  The chart below depicts the clear divergence of IBM's common stock price and comparable market indices as the truth became known to the market:



152.    The S&P 500 Index and the S&P Information Technology Index are appropriate indices by which to assess the movement of the Company's common stock in comparison to the overall market and IBM's peer companies.  IBM used these indices as comparators in discussing the market for the Company's common stock in its Form 10-K Annual Report for 2014, filed with the SEC on February 24, 2015.

**2.    Press and Analyst Reactions**

153.    The financial press reacted strongly to the severe, lopsided nature of IBM's deal with GlobalFoundries.  On October 20, 2014, *The Wall Street Journal* published an article titled "Globalfoundries to Take Over IBM Chip Unit."  The article quoted an analyst at VLSI Research, a technology research firm: "[Y]ou would think that IBM would have gotten cash for it, not the other way around."  VLSI Research was again quoted the next day in the *Albany*

*Business Review:* "This is the first time anyone has ever paid someone to take semiconductor manufacturing off their hands."

154.    *The Wall Street Journal* observed separately on October 20 that the bad news was a hit specific to IBM.  The *Journal* stated that IBM's "results stood in contrast to Apple Inc., which on Monday posted a 13 percent profit increase on strong September sales of its larger-screen iPhones."

155.    Also on October 20, 2014, *Forbes* published an article titled "Globalfoundries Will Try To Make Lemonade From IBM's Lemons," remarking at "the odd terms of the deal, which has IBM paying Globalfoundries, like some garbage collector, to take the material away."

156.    Also on October 20, 2014, *Fortune* published an article titled "IBM dumps its chips division, reports weak earnings."  The article noted the "$4.7 billion pre-tax charge related to the sale of the company's chip division to Globalfoundries."  The article concluded that "IBM's quarter profit for the latest period totaled just $18 million due to the charge."

157.    The *Financial Times* confirmed on October 20, 2014 that IBM "had shed its lossmaking chip manufacturing arm [to] avoid the billions of dollars in capital spending it was facing to upgrade its manufacturing technology."  The article also pointed out that "[t]he huge cost of upgrading equipment and manufacturing processes for each new generation of chips, which involves shrinking the elements in a semiconductor to ever-smaller sizes has already forced other[] [foundries] to quit."

158.    Securities analysts also indicated dismay.  An October 22, 2014 analyst research note from Trefis titled "IBM Earnings: Revenues Miss Expectations Amidst Corporate Restructuring," noted that "[e]ven before the results were announced, sentiment surrounding the

44

stock was negative after IBM said that it had at last achieved an agreement to transfer its loss-making semiconductor business to Globalfoundries Inc."

159.    Société Générale issued a report on October 21, 2014 titled "How fast can an elephant learn to dance to a new tune?"  SocGen reiterated its "Sell" recommendation "following a poor Q3 earnings release and the disposal of the chip-making business to GlobalFoundries, both announced yesterday."

160.    The next day, in a report titled "IBM to disappoint further," Indigo Equity Research sharply criticized IBM's "Disastrous Q3 2014 Results":

> **Management execution is failing badly and a new CEO is needed to turnaround IBM.  Explanations for poor performance and the lack of proposed remedies did not reassure.**  Given the circumstances, we wonder if CEO Virginia Rometty was either set up as a patsy or is inept; as things started to go wrong soon after she took office in 2012.

161.    Indigo Equity led its summary of "Significant Recent Events" with "IBM to pay GlobalFoundries $1.5 bn to take its loss-making chip manufacturing arm," and noted that "*[t]his structure, paying someone to acquire a subsidiary, is highly unusual.*  Also, in doing this, IBM will lose control of the design of its chips."

## C.    IBM Files Its Form 10-Q for Third Quarter 2014

162.    On October 28, 2014, IBM filed its Form 10-Q Quarterly Report for the third quarter of 2014, ended September 30, 2014 ("3Q14 Form 10-Q").  The 3Q14 Form 10-Q was signed by Defendant Kavanaugh and confirmed that during the quarter, IBM wrote off the entire value of Microelectronics' long-lived assets:

> In the third quarter, the company recorded a pre-tax charge of $4.7 billion related to the sale of the Microelectronics disposal group, which was part of the Systems and Technology reportable segment.  The pre-tax charge was recorded to reflect the fair value less the estimated cost of selling the disposal group including *an impairment to the semiconductor long-lived assets of $2.4 billion*,

$1.5 billion representing the cash consideration expected to be transferred to GLOBALFOUNDRIES and $0.8 billion of other related costs.  The asset impairment was reflected in property, plant and equipment, net and the other costs of disposal were reflected in other accrued expenses and liabilities and other liabilities in the Consolidated Statement of Financial Position at September 30, 2014.

163.    The 3Q14 Form 10-Q also reported the dismal financial performance announced on October 20, 2014, marking IBM's tenth consecutive quarter of declining revenue and earnings.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

164.    As alleged herein, Defendants had actual knowledge of the false and misleading nature of the statements they made, or acted with reckless disregard of the true information known to them.  In doing so, Defendants committed acts, and practiced and participated in a course of conduct that operated as a fraud or deceit on purchasers of IBM common stock during the Class Period.

165.    As alleged herein, Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that these documents or statements were issued or disseminated to the investing public, and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants participated in the fraudulent scheme by virtue of their receipt of information reflecting the truth regarding the carrying value of Microelectronics' long-lived assets, their control over and receipt or dissemination of the Company's materially false and misleading statements, and their associations with the Company that made them privy to material, non-public information about unit's true carrying value.

46

166.    During the Class Period, Defendants undertook various efforts and conduct, unbeknownst to the investing public, that: (1) raise a strong inference that Defendants knew or recklessly disregarded the actual carrying value of the Microelectronics unit's long-lived plant, property and equipment assets, resulting in the failure to direct recoverability testing and to record any impairment losses, as required by GAAP; and (2) were inconsistent with Defendants' statements to the investing public alleged herein to be materially false and misleading.

167.    During the Class Period, rather than properly and timely test the Microelectronics unit's long-lived property, plant, and equipment assets and take the resulting impairment loss, Defendants assigned an approximately $2.4 billion carrying value to the assets reflected in the financial statements it filed with the SEC and issued to investors, even though Defendants knew the assets were essentially worthless.  The unit lost $638 million in 2012 and $720 million in 2013, and was on track for a similar loss in 2014.  Defendants knew IBM would not be able to sell the Microelectronics unit for more than $1 billion based only on the engineering expertise and intellectual property associated with the unit.  Accordingly, Defendants knew or recklessly ignored that Microelectronics' long-lived assets were worthless and should have been impaired and reported no later than the quarter ended December 31, 2013.

168.    As alleged in Part V.B above, Defendants received, but ignored, indications from objective market sources regarding the value of the Microelectronics assets that differed significantly from the Company's own recorded asset values.  Defendants disregarded mounting objective evidence of overvaluation of the Microelectronics assets.  Not later than 2013, IBM was actively seeking a buyer for a unit that, as Defendants alone knew, was losing hundreds of millions of dollars a year.  The weak performance of the Microelectronics business and the Company's inability to secure a buyer—in particular, a buyer that would pay anything close to

the $2.4 billion carrying value—are objective facts that required IBM to test the assets for recoverability long before the third quarter of 2014. This is especially true against the backdrop of IBM's publicly articulated strategy of divesting low-margin and money-losing operations and the Company's recent history of selling once-core businesses like the PC business.

169.     Further, as alleged in Part V.B.2 above, Microelectronics was consistently losing money in the years leading up to the sale. Specifically, in 2012 and 2013, the unit lost a combined $1.358 billion, more than half the value assigned to the entire unit's long-lived assets. Taking into account losses incurred by the unit in 2014 (before the announcement of the sale), Microelectronics, whose long-lived assets were valued at $2.4 billion as of December 31, 2013, lost nearly $2 billion over the course of three years. The facts were first disclosed by IBM only after the announcement of the GlobalFoundries deal.

170.     A substantial portion of the Microelectronics unit's $720 million in losses for 2013 had been incurred by the end of the third quarter of 2013, and Defendants had reasonable visibility of the ultimate full-year 2013 results for the unit as well as projections for similarly poor performance in 2014. Moreover, IBM's efforts to rid itself of the unit were an integral part of the Company's strategy to boost EPS by exiting low-margin and money-losing business. Thus, the performance of the unit was sufficiently poor as of the start of the fourth quarter of 2013 to trigger Defendants' obligation to test the long-lived assets for recoverability (and potential impairment loss) as part of the Company's financial reporting for the fourth quarter and year-end 2013.

171.     As alleged in Part V.B.3 above, Defendants knew or recklessly disregarded information demonstrating that the carrying value recorded by the Company with respect to Microelectronics' assets was significantly overstated. The chips produced at Essex Junction

48

were cheap and ancient by technical standards, and the facility produced those chips significantly less efficiently than foundries operated by other chip manufacturers. The chips produced at the East Fishkill facility were also consistent money-losers for IBM; however, the needs of the Company's server manufacturing unit required these chips. Nonetheless, because of significant decreases in IBM's server revenue, the East Fishkill facility, which supplied chips almost solely for IBM's servers, operated at a reduced capacity, making it worth even less. Further, by all industry production metrics, IBM's Microelectronics facilities were subpar and unprofitable.

172.    The Individual Defendants each committed themselves to accomplishing the goals laid out in the Roadmap, including the divestment strategy embraced by that plan's guidance. Although former IBM CEO Samuel Palmisano initially announced the Company's Roadmap strategy, Rometty and the other Individual Defendants ratified and took ownership of that business strategy publicly, and made references prior to and throughout the Class Period to the 2015 Roadmap's critical importance to IBM's long-term plan and future prospects. According to a September 20, 2012 article in *Forbes* magazine, Defendant Rometty helped conceive the 2015 Roadmap and its aggressive, doubled-down EPS goal when she worked under Palmisano as head of the Global Business Services segment, and personally took ownership of that strategy when she became CEO in January 2012.

173.    Defendant Schroeter has publicly voiced his support for the Roadmap, stating in a November 13, 2013 article in *Monitor Daily*, a publication for the equipment finance and leasing industry, that he "look[ed] forward to working with [Rometty] . . . to deliver our 2015 [R]oadmap and its objectives[.]" Defendant Kavanaugh signed IBM's Form 8-K Current Report, filed with the SEC on May 12, 2010, annexing the press release announcing the 2015 Roadmap.

174.     Each of the Individual Defendants was a hands-on manager closely involved with IBM's long-term planning processes, especially with respect to those aspects of IBM's business strategy aimed at accomplishing the EPS goal laid out in the 2015 Roadmap.  Specifically, they attended regular meetings discussing the implementation of the Roadmap strategy, and required that they be kept up-to-date regarding all significant Company developments that could impact IBM's ability to produce the $20 EPS promised to investors.

175.     Under accounting rules and regulations established by the Sarbanes-Oxley Act of 2002 ("SOX"), Defendants were responsible for routinely assessing whether impairment indicators were present, and were required to have systems and processes in place to assist in the identification of potential impairment indicators.  Pursuant to SOX, Defendants Rometty and Schroeter certified in the Company's SEC filings that they had personally "evaluated [IBM's] disclosure controls and procedures" and had concluded that such disclosure controls were effective.  Rometty and Schroeter further certified that IBM's internal disclosure controls and procedures were designed to, and did, keep them apprised of all material facts about the Company's financial condition and results of operations, including the financial condition of the Microelectronics unit.

176.     The magnitude and scale of the write-down and charge, revealing that the Microelectronics assets were held on the Company's books at an extremely inflated value, independently support a strong inference of scienter.  IBM disclosed the true carrying value of its Microelectronics unit by recording a total write-down of $2.4 billion in asset value, or approximately $2.42 on a per-share basis, as part of the $4.7 billion charge.  The charge was unusual, nonroutine, and unexpected by the market, and indeed the largest taken by the Company in at least 20 years.  It is highly unlikely that the overall circumstances related to the

50

Microelectronics unit changed so dramatically in only one quarter as to require a write-down of the entire value of the business, and equally unlikely that the tangible, long-lived assets of the unit that represented $2.4 billion of the charge were suddenly rendered worthless.

177.    As alleged in Part V.C above, had IBM performed the asset recoverability testing required under GAAP, the Company necessarily would have had to recognize the impairment losses associated with these assets in its 2013 financial statements.  The recognition of such impairment losses at the end of 2013 would have been a massive disruption, effectively making it impossible for the Company to deliver $18 EPS for 2014, or $20 EPS by 2015 as had been promised for years.  IBM's EPS for 2013 would have fallen by 21% to $11.83 (from $14.94), and the Company's EPS for first quarter 2014 would have been 144% lower than reported.

178.    IBM acted with "corporate" scienter such that material misrepresentations about the value of the Microelectronics unit's long-lived assets and the Company's compliance with GAAP impairment rules applicable to such long-lived assets were so important to the accomplishment of the strategy laid out in the 2015 Roadmap and to the Company's ongoing business operations that those statements were approved by corporate officials sufficiently knowledgeable about the Company to know that the statements were false or misleading.  At least one authorized agent, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statements in which the misrepresentations were made before their utterance or issuance.  Moreover, at least one authorized agent of the Company ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance.

## VIII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    Fourth Quarter 2013 Financial Results and EPS Guidance

179.    The Class Period begins on January 22, 2014.  On January 21, 2014, after the close of trading, IBM issued a press release reporting its financial results for the fourth quarter and full year ended December 31, 2013 (the "4Q13 Press Release").  The 4Q13 Press Release was filed with the SEC on Form 8-K the same day.

180.    In the 4Q13 Press Release, the Company announced diluted GAAP earnings of $5.73 per share for the fourth quarter of 2013, and diluted GAAP earnings of $14.94 per share for the full year ended December 31, 2013.

181.    The 4Q13 Press Release further stated, quoting Defendant Rometty:

> We continued to drive strong results across much of our portfolio and again grew earnings per share in 2013. . . .
>
> As we enter 2014, we will continue to transform our business and invest aggressively in the areas that will drive growth and higher value.  *We remain on track toward our 2015 roadmap for operating EPS of at least $20*, a step in our long-term strategy of industry leadership and continuous transformation.

182.    The same day, IBM held a conference call with analysts and investors to discuss its financial results (the "4Q13 Earnings Call").  Prepared remarks for the call were filed with the SEC on Form 8-K.  Defendant Schroeter participated in the 4Q13 Earnings Call, during which he reiterated IBM's earnings guidance for 2014, stating in part:

> A month or so ago, before I assumed the CFO job, I met with a number of investors and analysts.  And one of the things I took away is that it's important for me to be clear on IBM's 2015 road map objective, and our ability to achieve the earnings per share.
>
> So I want to start out by saying that *we continue to expect to deliver at least $20 of operating EPS in 2015*.  We'll talk about 2014 a little later, and you'll see that our view of 2014 keeps us on track to that objective.

* * *

As always, we're positioning our business for the future. And as I noted, *we continue to expect to achieve at least $20 in 2015 along the way*.

* * *

As we look forward to 2014, we'll continue our transformation, shifting our investments to the growth areas, and mixing to higher value. We'll acquire key capabilities. We'll divest businesses, and we'll rebalance our workforce as we continue to return value to shareholders.

*Our current view of all of this is included in our expectation of at least $18 of operating EPS in 2014*. That's up 10.5% from $16.28 in 2013.

We'll see the benefits of the first quarter rebalancing action later in the year. As a result, we expect our first quarter EPS to be about 14% of the full year, reflecting the modest gain, workforce rebalancing charge, and continued impact from currency. For these reasons, our first quarter skew in 2014 should be lower than our historical skew, which has been about 18% of the full year over the last few years.

And importantly, we expect to grow our free cash flow in 2014 by about $1 billion. That's faster than net income, even after absorbing another significant cash tax headwind, and growing capital expenditures. *All of this keeps us on track to our 2015 objective of at least $20 of operating EPS*.

183.    Analysts were generally reassured by IBM's positive guidance. On January 21, 2014, Jefferies rated IBM stock "Hold," noting that "Inline 2014 guidance better than feared but back-end loaded."

184.    On January 22, 2014, Wells Fargo rated IBM stock "Market Perform" and noted that IBM's "2014 EPS guidance of at least $18.00 is in line with Street [estimates]"; that "IBM is well positioned with its transformation"; and "We see upside potential if IBM continues to execute well and generates higher EPS growth."

53

185.    Also on January 22, 2014, Cantor Fitzgerald gave IBM stock a "BUY rating and $220.00 price target" and noted that the "results . . . exceeded our projections, and the company provided what we consider a palatable 2014 EPS outlook, while maintaining its 2015 EPS projection."  The report predicted that "the worst is over for IBM in the intermediate term."

186.    The statements in the 4Q13 Press Release announcing diluted GAAP earnings of $5.73 per share and $14.94 per share for the fourth quarter of 2013 and full year ended 2013, respectively, were materially false and misleading when made.  For the reasons set forth and as more fully alleged in Part V above, had Defendants tested the Microelectronics unit's long-lived property, plant, and equipment assets for recoverability and recognized an impairment loss as required by GAAP, IBM would have announced diluted GAAP earnings of approximately $2.62 per share for the fourth quarter of 2013 (54% lower than reported), and diluted GAAP earnings of approximately $11.83 per share for the full year ended December 31, 2013 (21% lower than actually reported).  *See* Part V.D., Table 1.

187.    The statements made by Defendant Rometty in the 4Q13 Press Release and by Defendant Schroeter during the 4Q13 Earnings Call were materially false and misleading when made, and lacked a reasonable basis.  Rometty's statement that IBM was on track to achieve $20 in operating EPS in 2015, and Schroeter's statements that IBM was on track to achieve $18 in operating EPS in 2014 or $20 in operating EPS in 2015, were false and misleading because at that time, as Rometty and Schroeter knew but failed to disclose, or recklessly disregarded, and as alleged in greater detail in Part IV.F.2 through Part IV.H above, the commercial and technological realities surrounding the Company's Microelectronics business made achieving these milestones highly unlikely, if not impossible.

54

188.    Specifically, Microelectronics' long-lived assets had become obsolete and worthless over the past several years.  IBM also lacked sufficient scale to operate its Microelectronics business profitably, even to supply its proprietary mainframes and servers.  As a result, the unit incurred losses of $638 million in 2012 and $720 million in 2013 and Defendants expected a comparable loss for 2014.  IBM had also decided that it was unwilling to invest further in these facilities.  Instead, IBM had been trying to sell Microelectronics since at least 2013 but had found no buyer.  Rometty and Schroeter knew, but failed to disclose, or recklessly disregarded, that when IBM took the charge necessary to divest Microelectronics—an ultimate charge of $4.7 billion—the Company would inevitably be forced to miss its guidance of operating EPS of $18 in 2014 and $20 in 2015 and cancel the 2015 Roadmap.

**B.**    **2013 Form 10-K and Annual Report to Investors**

189.    On February 25, 2014, IBM filed with the SEC its Annual Report on Form 10-K for the full year ended December 31, 2013 (the "2013 Form 10-K").  The 2013 Form 10-K was signed by Defendants Rometty, Schroeter, and Kavanaugh, and incorporated by reference the financial statements set forth in IBM's 2013 Annual Report to Investors.

190.    The Company reported in the 2013 Form 10-K that the Company's net income for the full year ended December 31, 2013 was $16.483 billion, and reported diluted GAAP earnings of $14.94 per share for that period.

191.    The 2013 Form 10-K also included the following representations about IBM's accounting practices:

> The Consolidated Financial Statements and the Notes have been prepared in accordance with accounting principles generally accepted in the United States (GAAP).

*       *       *

*Long-lived assets, other than goodwill and indefinite-lived intangible assets, are tested for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable*. The impairment test is based on undiscounted cash flows and, if impaired, the asset is written down to fair value based on either discounted cash flows or appraised values. Goodwill and indefinite-lived intangible assets are tested annually, in the fourth quarter, for impairment and whenever changes in circumstances indicate an impairment may exist.

192.    The 2013 Form 10-K included the following representations regarding controls and procedures at Item 9A, and a SOX certification signed by Defendant Rometty, incorporated therein as Exhibit 31.1, which stated:

The company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the company's disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the company's disclosure controls and procedures were effective as of the end of the period covered by this report.

Refer to ''Report of Management'' and ''Report of Independent Registered Public Accounting Firm'' on pages 76 and 77 of IBM's 2013 Annual Report to Stockholders, which are incorporated herein by reference. There has been no change in the company's internal control over financial reporting that occurred during the fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.

\*        \*        \*

I, Virginia M. Rometty, certify that:

1.    I have reviewed this annual report on Form 10-K of International Business Machines Corporation;

2.    ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3. ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board***

> **of directors (or persons performing the equivalent functions)**:
>
> a. **all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and
>
> b. **any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

193.     The 2013 Form 10-K also included a substantially similar SOX certification, signed by Defendant Schroeter, as Exhibit 31.2.

194.     The statements in the 2013 Form 10-K reporting net income of $16.483 billion for the full year ended December 31, 2013, and diluted GAAP earnings of $14.94 per share for the same period, were materially false and misleading when made.  For the reasons set forth and as more fully alleged in Part V above, had the Company tested the Microelectronics unit's long-lived property, plant, and equipment assets for recoverability and recognized an impairment loss as required by GAAP, IBM would have reported net income for the full year ended December 31, 2013 of approximately $13.051 billion (21% lower than actually reported), and diluted GAAP earnings of approximately $11.83 per share (21% lower than actually reported).  *See* Part V.D, Tables 1 and 2.

195.     Defendants' statement in the 2013 Form 10-K reporting that "[l]ong-lived assets, other than goodwill and indefinite-lived intangible assets, are tested for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable" was false and misleading when made.  At that time, as Defendants knew but failed to disclose, or recklessly disregarded, and as alleged in greater detail in Part V above, IBM had improperly

failed to timely record a $2.4 billion impairment in the value of Microelectronics' assets. Specifically, the unit's long-lived assets had become obsolete and worthless over the past several years. IBM lacked sufficient scale to operate the unit business profitably. As a result, Microelectronics incurred losses of $638 million in 2012 and $720 million in 2013 and Defendants expected a comparable loss for 2014. IBM had also decided that it was unwilling to invest further in these facilities. Instead, IBM had been trying to sell the unit since at least 2013 but had found no buyer. For the reasons set forth in Part V above, the Company failed to conduct recoverability testing as required by GAAP despite events or changes in in circumstances with respect to the Microelectronics unit's assets.

196.    Defendant Rometty's SOX certification in the 2013 Form 10-K that "the company's disclosure controls and procedures were effective as of the end of the period covered by this report" was materially false and misleading when made because at that time, as Rometty knew but failed to disclose, or recklessly disregarded, IBM's disclosure controls and internal controls over its financial reporting had a material weakness or significant deficiency and failed to detect the fact that Microelectronics' long-lived assets were impaired and in fact worthless to the Company. Effective controls allow for, among other things, detection of potential material misstatements, such as those alleged herein.

197.    Defendants Rometty and Schroeter's SOX certifications that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were materially false and misleading when made for the same reasons, and because they both knew, but failed to disclose,

or recklessly disregarded, that IBM's financial statements were presented in violation of GAAP and were materially false and misleading as discussed in Part V above.

198.    Defendants Rometty and Schroeter's SOX certifications that they had "disclosed . . . all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information" and had "disclosed . . . any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting" were materially false and misleading when made for the same reasons discussed in Part V above.

## C.    First Quarter 2014 Financial Results and EPS Guidance

199.    On April 16, 2014, after the close of trading, IBM issued a press release announcing its financial results for the first quarter of 2014, ended March 31, 2014 (the "1Q14 Press Release"). The 1Q14 Press Release was filed with the SEC on Form 8-K the same day.

200.    In the 1Q14 Press Release, the Company announced diluted GAAP earnings of $2.29 per share. The Company also stated that it:  ***"Expect[ed] full-year operating (non-GAAP) EPS of at least $18.00.***"

201.    The same day, IBM held a conference call with analysts and investors to discuss its financial results (the "1Q14 Earnings Call"). Prepared remarks for this call were filed with the SEC on Form 8-K. Defendant Schroeter participated in the 1Q14 Earnings Call, and reiterated IBM's earnings guidance for 2014:

> For the year, ***we expect to deliver at least $18 of operating earnings per share for 2014***. This does not include any gain from the sale of our System x business to Lenovo because of the uncertainty of the timing and the amount, but it will ultimately be included in our operating EPS results, and we'll update you later in the year.

Like always, we manage our business and allocate capital for the long term, and along the way, ***we still expect to deliver at least $20 of operating EPS in 2015***.

*        *        *

In terms of the $18, we said that we would get to at least $18. We said in the first quarter that we would do about 14% of that, and that's where we came in, at 14%.

*        *        *

Given that quarterly phenomenon, a charge in the first quarter of this year but none the second versus the prior, we would think that the first half . . . is going to look a lot like last year, and we'll probably get about 38% of our full year EPS done by the end of the first half.

And then when we look at the second half, we'll see consistent growth with what we need on a full year basis at 10.5, and given the transactional nature and the momentum in some of our businesses, we would say it would probably be a little bit faster in the fourth than in the third.

202.    Analysts were again reassured by IBM's reaffirmed EPS guidance. On April 16, 2014, Deutsche Bank noted that despite "[m]ixed F1Q-14 results, guidance of EPS of at least $18 in FY-14 EPS intact." The same day, RBC Capital Markets issued a report titled "IBM Reports EPS In Line with Expectations; Maintains FY14 Guide of $18 EPS."

203.    On April 17, 2014, Cantor Fitzgerald rated IBM stock a "Buy," noting that IBM "reiterated its outlook of at least $18.00 in operating EPS in 2014 and $20.00 in 2015." Based on the "EPS projection," the report concluded that "the stock is . . . attractive." The same day, RBC Capital Markets noted that IBM's "2014 EPS guidance of $18.00+ . . . remains prudent at this point" and predicted that "y/y performance should accelerate from Q3 to Q4."

204.    The statements in the 1Q14 Press Release announcing diluted GAAP earnings of $2.29 per share for the first quarter of 2014 were materially false and misleading when made. For the reasons set forth and as more fully alleged in Part V above, had the Company tested the

61

Microelectronics unit's long-lived property, plant, and equipment assets for recoverability and recognized an impairment loss as required by GAAP, IBM would have announced diluted GAAP *losses* of approximately $1.00 per share for the first quarter of 2014 (144% lower than reported). *See* Part V.D, Table 1.

205.   Additionally, the statements made by Defendant Schroeter during the 1Q14 Earnings Call were materially false and misleading when made, and made without a reasonable basis. IBM's and Schroeter's statements that the Company was on track to achieve $18 in operating EPS in 2014, and Schroeter's statement that the Company was on track to achieve $20 in operating EPS in 2015, were false and misleading because at that time, as Schroeter knew but failed to disclose, or recklessly disregarded, and as alleged in greater detail in Part IV.F.2 through IV.H above, the commercial and technological realities surrounding Microelectronics made achieving these milestones highly unlikely, if not impossible.

206.   Specifically, Microelectronics' long-lived assets had become obsolete and worthless over the past several years. IBM lacked sufficient scale to operate the unit profitably. As a result, Microelectronics incurred losses of $638 million in 2012 and $720 million in 2013 and Defendants expected a comparable loss for 2014. IBM had also decided that it was unwilling to invest further in these facilities. Instead, IBM had been trying to sell the unit business since at least 2013 but had found no buyer. Schroeter knew, but failed to disclose, or recklessly disregarded, that when IBM took the necessary charge to divest Microelectronics— which charge was ultimately $4.7 billion—the Company would inevitably be forced to miss its guidance of operating EPS or $18 in 2014 and $20 in 2015 and abandon the 2015 Roadmap.

### D.   Form 10-Q for First Quarter 2014

207.   On April 29, 2014, IBM filed with the SEC its Form 10-Q Quarterly Report for the first quarter of 2014, ended March 31, 2014 (the "1Q14 Form 10-Q").

208.    The 1Q14 Form 10-Q was signed by Defendant Kavanaugh, and reported net income of $2.384 billion for the first quarter of 2014, and reported diluted GAAP earnings of $2.29 per share for that period.

209.    The 1Q14 Form 10-Q further contained financial statements that represented, among other things, that:

> The accompanying Consolidated Financial Statements and footnotes of the International Business Machines Corporation (IBM or the company) have been prepared in accordance with accounting principles generally accepted in the United States of America (GAAP).

> \*        \*        \*

> ***Non-financial assets such as property, plant and equipment, land, goodwill and intangible assets are also subject to nonrecurring fair value measurements if they are deemed to be impaired***.  The impairment models used for nonfinancial assets depend on the type of asset.  See Note A, "Significant Accounting Policies - Impairment," on page 88 in the company's 2013 Annual Report for additional information.  ***There were no material impairments of non-financial assets for the three months ended March 31, 2014 and 2013, respectively.***

210.    The financial statements in the 1Q14 Form 10-Q were also certified by Defendants Rometty and Schroeter pursuant to SOX and subject to representations regarding IBM's disclosure and internal controls substantially similar in all material respects to those set forth in Paragraph 192 above.

211.    The statements in the 1Q14 Form 10-Q reporting net income of $2.38 billion for the first quarter of 2014, and diluted GAAP earnings per share of $2.29 for the same period, were materially false and misleading when made.  For the reasons set forth and as more fully alleged in Part V above, had the Company tested the Microelectronics unit's long-lived property, plant, and equipment assets for recoverability and recognized an impairment loss as required by GAAP, IBM would have reported a net ***loss*** of approximately $1.048 billion (144% lower than

the positive income actually reported), and *losses* of approximately $1.00 per share (144% lower than actually reported) for the first quarter of 2014.  *See* Part V.D, Tables 1 and 2.

212.    Defendants' statement in 1Q14 Form 10-Q that "[t]here were no material impairments of non-financial assets for the three months ended March 31, 2014 and 2013, respectively" was false and misleading when made.  At that time, as Defendants knew but failed to disclose, or recklessly disregarded, and as alleged in greater detail in Part V above, IBM had improperly failed to timely record a $2.4 billion impairment in the value of Microelectronics' assets.  Specifically, the unit's long-lived assets had become obsolete and worthless over the past several years.  IBM lacked sufficient scale to operate the unit business profitably.  As a result, Microelectronics incurred losses of $638 million in 2012 and $720 million in 2013 and Defendants expected a comparable loss for 2014.  IBM had also decided that it was unwilling to invest further in these facilities.  Instead, IBM had been trying to sell the unit since at least 2013 but had found no buyer.  For the reasons set forth in Part V.D above, the Company failed to conduct recoverability testing as required by GAAP despite events of changes in circumstances with respect to the Microelectronics unit's assets.

        **E.    Second Quarter 2014 Financial Results and EPS Guidance**

213.    On July 17, 2014, IBM issued a press release announcing its financial results for the second quarter of 2014, ended June 30, 2014 (the "2Q14 Press Release").  The 2Q14 Press Release was filed with the SEC on Form 8-K the same day.

214.    In the 2Q14 Press Release, the Company announced diluted GAAP earnings of $4.12 per share for the second quarter of 2014.

215.    The same day, IBM held a conference call with analysts and investors to discuss its financial results (the "2Q14 Earnings Call").  Prepared remarks for this call were filed with

the SEC on Form 8-K.  During the 2Q14 Earnings Call, Defendant Schroeter discussed the

Company's earnings and outlook, stating:

> Let me spend a minute on the first-half performance.  The revenue performance for the half is very similar to the second quarter.  Through six months we had double-digit revenue growth in strategic initiatives, stable performance in our core franchises, and the impact of some secular trends in parts of hardware and from the divested business.

> Looking at profit, we expanded gross margin 50 basis points, pre-tax margin by 70 basis points, and net margin by 50 basis points.  All while shifting investment to key areas.  Operating earnings per share for the first half were up 9.5%.

> *        *        *

> Systems and Technology revenue of $3.3 billion was down 11%.  This is a significant improvement in the year-to-year performance compared to last quarter.  The improvement was driven by system z, as well as sequential improvements in system x and storage.  This, together with actions to align our structure to the demand profile, result[ed in] progress in stabilizing our profit.

> *        *        *

> As we've discussed over the last couple of earnings calls, **our focus for [the Systems and Technology Group] in 2014 is to stabilize the profit base and after the first half, are on track.**

216.    Defendant Schroeter also spoke about IBM's 2014 earnings guidance, stating:

> As we look to the full year of 2014, **we expect to deliver at least $18 of operating earnings per share and we still expect to deliver at least $20 of operating earnings per share in 2015**.  These are points along the way to delivering performance, and shareholder value over the long term.

> *        *        *

> In the second half, we see . . . our software revenue growth accelerating to mid-single digit.  And we see our services profit growth of mid-single digit driven by productivity in the base.  And then on STG . . . , we see that profit stabilization still.  So when I think about the second half, and how that plays out, as we did 90 days ago, . . . **I think EPS growth** in the second half will be a little

bit faster in the fourth than in the third.  So kind of double-digit fourth quarter EPS and a *single-digit third quarter EPS*.

217.    Analysts responded favorably to Defendants' announcements.  On July 17, 2014, Deutsche Bank Markets Research reported that "EPS of $4.32 were above expectations"; that "Valuation remains fair"; and that "guidance of EPS of at least $18 in FY-14 EPS intact."  The same day, *Forbes* commented that "IBM appears to have slowed the bleeding [in] its most dragging unit in recent months, its systems and technology group."  Similarly, on July 18, 2014, UBS Securities noted that IBM had "reiterated guidance of $18 in non-GAAP EPS in 2014 and $20 in 2015" while reporting that "[g]radual improvement suggests the worst may be over."

218.    The statements made in the 2Q14 Press Release announcing diluted GAAP earnings of $4.12 per share were materially false and misleading when made.  For the reasons set forth and as more fully alleged in Part V above, had the Company tested the Microelectronics unit's long-lived property, plant, and equipment assets for recoverability and recognized an impairment loss as required by GAAP, IBM would have announced diluted GAAP earnings of approximately $0.71 per share for the second quarter of 2014 (144% lower than reported).  *See* Part V.D., Table 1.

219.    The statements made by Defendant Schroeter during the 2Q14 Earnings Call were materially false and misleading when made, and Defendants had no reasonable basis to make such statements.  Schroeter's statements that IBM was "on track" to "stabilize the profit base" and expected to achieve $18 in operating EPS in 2014 or $20 in operating EPS in 2015 were false and misleading because at that time, as Schroeter knew but failed to disclose, or recklessly disregarded, and as alleged in greater detail in Part IV.F.2 through Part IV.H above, the commercial and technological realities governing Microelectronics' business made achieving these goals highly unlikely, if not impossible.

66

220.     Specifically, Microelectronics' long-lived assets had become obsolete and worthless over the past several years.  IBM lacked sufficient scale to operate the unit business profitably.  As a result, Microelectronics incurred losses of $638 million in 2012 and $720 million in 2013 and Defendants expected a comparable loss for 2014.  IBM had also decided that it was unwilling to invest further in these facilities.  Instead, IBM had been trying to sell the unit business since at least 2013 but had found no buyer.  Rometty and Schroeter knew, but failed to disclose, or recklessly disregarded, that when IBM took the necessary charge to divest Microelectronics—which ultimately was $4.7 billion—the Company would inevitably miss its guidance of operating EPS or $18 in 2014 and $20 in 2015, and abandon the 2015 Roadmap.

F.    **Form 10-Q for Second Quarter 2014**

221.     On July 29, 2014, IBM filed its Form 10-Q Quarterly Report for the second quarter of 2014, ended June 30, 2014 (the "2Q14 Form 10-Q").

222.     The 2Q14 Form 10-Q was signed by Defendant Kavanaugh, and reported net income for the second quarter of 2014 of $4.137 billion, and reported diluted GAAP earnings of $4.12 per share for the same period.

223.     The 2Q14 Form 10-Q contained financial statements that represented, among other things, that:

> The accompanying Consolidated Financial Statements and footnotes of the International Business Machines Corporation (IBM or the company) have been prepared in accordance with accounting principles generally accepted in the United States of America (GAAP).
>
> *          *          *
>
> ***Non-financial assets such as property, plant and equipment, land, goodwill and intangible assets are also subject to nonrecurring fair value measurements if they are deemed to be impaired.***  The impairment models used for nonfinancial assets depend on the type of asset. See note A, "Significant Accounting

67

Policies - Impairment," on page 88 in the company's 2013 Annual Report for additional information. ***There were no material impairments of non-financial assets for the six months ended June 30, 2014 and 2013, respectively.***

224.     The financial statements in the 2Q14 Form 10-Q were also certified by Defendants Rometty and Schroeter pursuant to SOX, and subject to representations regarding IBM's disclosure and internal controls substantially similar in all material respects to those set forth in Paragraph 192 above.

225.     The statements in the 2Q14 Form 10-Q reporting net income of $4.137 billion for the second quarter of 2014, and diluted GAAP earnings per share of $4.12 for the same period, were materially false and misleading when made.  For the reasons set forth and as more fully alleged in Part V above, had the Company tested the Microelectronics unit's long-lived property, plant, and equipment assets for recoverability and recognized an impairment loss as required by GAAP, IBM would have reported net income of approximately $705 million (83% lower than actually reported), and earnings of $0.71 per share (83% lower than actually reported) for the first quarter of 2014.  *See* Part V.D, Tables 1 and 2.

226.     Defendants' statement in the 2Q14 Form 10-Q that "[t]here were no material impairments of non-financial assets for the six months ended June 30, 2014 and 2013, respectively" was materially false and misleading when made.  At that time, as Defendants knew but failed to disclose, or recklessly disregarded, and as alleged in greater detail in Part IV.F.2 through Part IV.H above, the commercial and technological realities governing Microelectronics' business significantly impaired those assets.  Specifically, Microelectronics' long-lived assets had become obsolete and worthless over the past several years.  IBM lacked sufficient scale to operate the unit profitably.  As a result, Microelectronics incurred losses of $638 million in 2012 and $720 million in 2013 and Defendants expected a comparable loss for 2014.  IBM had also

decided that it was unwilling to invest further in these facilities.  Instead, IBM had been trying to sell the unit business since at least 2013 but had found no buyer.  Defendants thus knew, but failed to disclose, or recklessly disregarded, that Microelectronics should not only have been written off as a complete loss, but that IBM would have to pay the acquirer more than $1 billion to take over the facilities.  For the reasons set forth in Part V above, the Company failed to conduct recoverability testing as required by GAAP despite events of changes in circumstances with respect to the Microelectronics unit's assets.

## IX.   LOSS CAUSATION AND ECONOMIC LOSS

227.   The market prices of IBM's common stock were artificially inflated by the material misstatements and omissions complained of herein, including the misstatements and omissions regarding the Company's financial statements and earnings guidance, the carrying value of Microelectronics' long-lived assets, and the Company's compliance with GAAP requirements regarding long-lived asset impairment.

228.   The artificial inflation in IBM's common stock was removed after IBM and GlobalFoundries issued a joint press release before the opening of trading on October 20, 2014, announcing that, as a result of the transfer of the Company's Microelectronics business to GlobalFoundries, IBM would write-down the carrying value of that unit's long-lived assets by $2.4 billion and take an extraordinary charge of $4.7 billion.  The October 20, 2014 news, more fully described above, caused the prices of IBM common stock to decline by material and statistically significant amounts, resulting in economic injury to Lead Plaintiff and other members of the Class.

## X.   INDIVIDUAL DEFENDANT AND
## CONTROLLING PERSON ALLEGATIONS

229.   During the Class Period, the Individual Defendants, as senior executive officers and/or directors of IBM, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants similarly had access to undisclosed adverse information about, among other things, the accuracy of the Company's financial statements, the reasonableness of the Company's EPS guidance, the carrying value of the Microelectronics unit's long-lived assets, and the Company's obligations under and compliance with GAAP regarding testing those assets for recoverability.  The Individual Defendants ascertained such information through IBM's internal corporate documents, conversations, and connection with each other and with corporate officers, employees, attendance at Board of Directors meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as IBM officers and directors.

230.   The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and knew, or recklessly disregarded, that there were material misstatements and omissions contained therein.  As a result of their executive or managerial positions with IBM, each of the Individual Defendants, no later than December 31, 2013, had access to the adverse undisclosed information that, pursuant to GAAP, required the Company to test Microelectronics' long-lived assets for recoverability and to recognize any resulting impairment losses in IBM's financial statements, as particularized herein, and knew (or recklessly disregarded) that these adverse undisclosed facts rendered the positive representations made by or about IBM and its business, or adopted by the Company, materially false and misleading.

70

231.   The Individual Defendants, because of their positions of authority and control as officers or directors of the Company, were able to, and did in fact, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

232.   As senior executive officers and/or directors and as controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act, and is traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to, among other things, the Company's financial position and performance, the carrying value of Microelectronics' long-lived assets, and the Company's compliance with GAAP concerning recoverability testing or impairment of long-lived assets. The Individual Defendants had a further duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information.  The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## XI.   <u>CLASS ACTION ALLEGATIONS</u>

233.   Lead Plaintiff brings this action on behalf of itself and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the common stock of IBM during the Class

Period and were damaged thereby.  Excluded from the Class are Defendants; present and former executive officers of IBM, members of IBM's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); the legal representatives, heirs, successors, or assigns of any of these individuals and entities; any entities in which Defendants have or had a controlling interest; and any subsidiary or affiliate of IBM.

234.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and to the Court.  Throughout the Class Period, IBM common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class.  As of February 10, 2015, IBM had 988,424,172 common shares outstanding, owned by thousands of persons.  Record owners and other members of the Class may be identified from records maintained by IBM or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

235.    There is a well-defined commonality of interest in the questions of law and fact involved in this action.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    whether Defendants violated the Exchange Act;

(b)    whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts;

72

(c)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew that the statements were false or misleading or acted with conscious misbehavior or reckless disregard as to the falsity or misleading nature of the statements made;

(e)     whether the prices of IBM's common stock were artificially inflated due to the misrepresentations and omissions of material fact alleged herein; and

(f)     whether and to what extent Class members sustained damages as a result of the conduct alleged herein, and the appropriate measure of damages.

236.     Lead Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class purchased or otherwise acquired IBM common stock during the Class Period and similarly sustained damages as a result of Defendants' wrongful conduct alleged herein.

237.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action securities litigation. Lead Plaintiff has no interests that are adverse or antagonistic to those of the Class.

238.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

**XII.   LEAD PLAINTIFF AND CLASS MEMBERS ARE**
**ENTITLED TO A PRESUMPTION OF RELIANCE**

239.   Lead Plaintiff and members of the Class are entitled to rely upon the presumption

of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose

material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   IBM common stock traded in efficient markets;

(d)   the misrepresentations alleged would tend to induce a reasonable

investor to misjudge the value of IBM common stock; and

(e)   Lead Plaintiff and other members of the Class purchased IBM

common stock between the time Defendants misrepresented or failed to disclose

material facts and the time the true facts were disclosed or the concealed risks

materialized, without knowledge of the misrepresented or omitted facts.

240.   At all relevant times, the markets for IBM's common stock were efficient for the

following reasons:

(a)   as a registered issuer, IBM filed periodic public reports with the

SEC;

(b)   IBM regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of

press releases on the major newswire services and through other wide-ranging

public disclosures, such as communications with the financial press, securities

analysts, and other similar reporting services;

(c)     IBM was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

(d)     IBM common stock was actively traded in an efficient market, namely the New York Stock Exchange, under the ticker symbol "IBM."

241.     As a result of the foregoing, the markets for IBM common stock promptly digested new material information regarding IBM from all publicly available sources and reflected such information in the price of those securities.

242.     Under these circumstances, all persons and entities that purchased IBM common stock during the Class Period suffered similar injury through their purchase of IBM securities at artificially inflated prices, and the presumption of reliance applies.

243.     Further, to the extent Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

244.     Accordingly, Lead Plaintiff and other members of the Class did rely and are entitled to have relied upon the integrity of the market prices for IBM common stock and to a presumption of reliance on Defendants' material misstatements and omissions during the Class Period.

**XIII.   THE STATUTORY SAFE HARBOR AND BESPEAKS
CAUTION DOCTRINE ARE INAPPLICABLE**

245.   The statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under the Private Securities Litigation Reform Act of 1995 do not apply to the misrepresentations and omissions alleged in this Complaint.

246.   None of Defendants' historic or present-tense statements alleged herein was a forward-looking statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

247.   To the extent that any of the materially false or misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, these statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

248.   Defendants are also liable for any false or misleading forward-looking statement alleged herein, or portion thereof, because at the time each forward-looking statement was made, the speaker knew that the forward-looking statement was false or misleading, and Defendants had no reasonable basis to make such statements, or the forward-looking statement was authorized and approved by an executive officer of IBM who knew that the forward-looking statement was false.

## XIV.    CAUSES OF ACTION

### COUNT I

### Asserted Against Defendant IBM for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder

249.    Lead Plaintiff repeats and alleges each and every allegation above as if fully set forth herein.  This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class against Defendant IBM.

250.    During the Class Period, officers, management, and agents of IBM carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, regarding the carrying value of the Microelectronics unit's long-lived assets; (ii) fail to test the unit's long-lived assets for recoverability as required by GAAP; (iii) fail to record an impairment loss regarding Microelectronics' long-lived assets; and (iv) deceive the investing public, including Lead Plaintiff and other Class members about IBM's compliance with GAAP guidelines regarding impairment of long-lived assets.

251.    Officers, management, and agents of IBM directly and indirectly, through the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain the illusion that IBM would meet or exceed its target EPS of $18 by the close of 2014 and $20 by

the end of 2015, and to maintain the Company's common stock at artificially inflated prices in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

252. Officers, management, and agents of IBM employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IBM's value and EPS performance, which included making untrue statements of material facts and omitting material facts necessary in order to make the statements about the carrying value of Microelectronics' long-lived assets, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein. Officers, management, and agents of IBM did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon purchasers of IBM common stock during the Class Period.

253. IBM is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, as the maker of statements and under the principle of respondeat superior.

254. In addition to the duties of full disclosure imposed on IBM as a result of the affirmative statements and reports made by its officers, management, and agents, or participation in the making of their affirmative statements and reports to the investing public IBM had a duty to promptly disseminate truthful information that would be material to investors, in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §§ 201.1-01 *et seq.*) and S-K (17 C.F.R. §§ 229.10 *et seq.*) and other SEC regulations including truthful, complete and accurate information with respect to the carrying value of Microelectronics' long-lived assets and the Company's compliance with GAAP requirements

relating to recoverability testing and recognition of impairment of such assets, and the intrinsic value of IBM's common stock to that the Company's common stock prices would be based on truthful, complete, and accurate information.

255.    The allegations above establish a strong inference that IBM, as an entity, acted with corporate scienter throughout the Class Period, as its officers, management, and agents had actual knowledge of misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing from the investing public the true carrying value of Microelectronics' long-lived assets and the Company's compliance with GAAP requirements relating to recoverability testing and recognition of impairment of such assets.  By concealing these facts from investors, IBM maintained its artificially inflated securities prices throughout the Class Period.

256.    In ignorance of the fact that IBM's common stock prices were artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by IBM, or upon the integrity of the markets in which that common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by IBM, but not disclosed in any public statement by IBM during the Class Period, Lead Plaintiff and the other members of the Class purchased or acquired IBM common stock during the Class Period at artificially high prices, and were damaged when that artificial inflation was removed from the price of IBM securities on and after October 20, 2014.

257.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff known the truth concerning the accuracy of the Company's financial statements, the reasonableness of the Company's EPS guidance, the carrying value of Microelectronics' long-lived assets, and the Company's lack of compliance with GAAP requirements relating to recoverability testing and recognition of impairment of such assets, and the intrinsic value of IBM common stock, Lead Plaintiff and other members of the Class would not have purchased or acquired their IBM common stock, or, if they had purchased or acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

258.    By virtue of the foregoing, Defendant IBM has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

259.    As a direct and proximate result of IBM's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases and acquisitions of IBM common stock during the Class Period.

## COUNT II

**Asserted Against the Individual Defendants for
Violations of Section 10(b) of the Securities Exchange
Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder**

260.    Lead Plaintiff repeats and alleges each and every allegation above as if fully set forth herein.  This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class against the Individual Defendants.

261.    During the Class Period, the Individual Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, regarding the carrying

value of the Microelectronics' long-lived assets; (ii) fail to test Microelectronics' long-lived assets for recoverability as required by GAAP; (iii) fail to record an impairment loss regarding Microelectronics' long-lived assets; and (iv) deceive the investing public, including Lead Plaintiff and other Class members about IBM's compliance with GAAP guidelines regarding impairment of long-lived assets.

262.    The Individual Defendants: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain the illusion that IBM would meet or exceed its target EPS of $18 by the close of 2014 and $20 by the end of 2015, and to maintain the Company's common stock at artificially inflated prices in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

263.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IBM's value and EPS performance, which included making untrue statements of material facts and omitting material facts necessary in order to make the statements about the carrying value of Microelectronics' long-lived assets, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein.  The Individual Defendants did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon purchasers of IBM common stock during the Class Period.

264.    In addition to the duties of full disclosure imposed on the Individual Defendants as a result of their affirmative statements, the Individual Defendants had a duty to promptly disseminate truthful information that would be material to investors, in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §§ 201.1-01 *et seq.*) and S-K (17 C.F.R. §§ 229.10 *et seq.*) and other SEC regulations including truthful, complete and accurate information with respect to the carrying value of Microelectronics' long-lived assets and the Company's compliance with GAAP requirements relating to recoverability testing and recognition of impairment of such assets, and the intrinsic value of IBM's common stock to that the Company's common stock prices would be based on truthful, complete, and accurate information.

265.    The allegations above establish a strong inference that the Individual Defendants acted with scienter throughout the Class Period, as they each had actual knowledge of misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing from the investing public the true carrying value of Microelectronics' long-lived assets and the Company's compliance with GAAP requirements relating to recovery testing and recognition of impairment of such assets.  By concealing these facts from investors, the Individual Defendants maintained IBM's artificially inflated securities prices throughout the Class Period.

266.    In ignorance of the fact that IBM's common stock prices were artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by

IBM, or upon the integrity of the markets in which that common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by IBM, but not disclosed in any public statement by IBM during the Class Period, Lead Plaintiff and the other members of the Class purchased or acquired IBM common stock during the Class Period at artificially high prices and were damaged when that artificial inflation was removed from the price of IBM stock on and after October 20, 2014.

267.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff known the truth concerning the accuracy of the Company's financial statements, the reasonableness of the Company's EPS guidance, the carrying value of Microelectronics' long-lived assets and the Company's lack of compliance with GAAP requirements relating to recoverability testing and recognition of impairment of such assets, and the intrinsic value of IBM common stock, Lead Plaintiff and other members of the Class would not have purchased or acquired their IBM common stock, or, if they had purchased or acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

268.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

269.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases and acquisitions of IBM common stock during the Class Period.

## COUNT III

### Asserted Against the Individual Defendants for Violations
### of Section 20(a) of the Securities Exchange Act of 1934

270.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all other members of the Class against the Individual Defendants.

271.    The Individual Defendants acted as controlling persons of IBM within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, their knowledge of the true carrying value of the Microelectronics unit's long-lived assets and the Company's failure to comply with GAAP requirements relating to recoverability testing and recognition of impairment of such assets, and the intrinsic value of IBM common stock, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading, and were culpable participants therein.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

272.    In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same and were culpable participants therein.  As set

84

forth above, IBM and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 10(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of IBM common stock during the Class Period.

## XV.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Lead Plaintiff and the members of the Class damages and pre-judgment interest;

C.    Awarding Lead Plaintiff reasonable costs, including attorneys' fees, litigation expenses and expert fees; and

D.    Awarding such equitable, injunctive or other relief that the Court may deem just and proper.

## XVI.  JURY DEMAND

Lead Plaintiff demands a trial by jury of all issues so triable.

Dated: New York, New York
   August 3, 2015

            LABATON SUCHAROW LLP

     By:  */s/ Joel H. Bernstein*
        Joel H. Bernstein
        David J. Goldsmith
        Matthew J. Hrutkay
        140 Broadway
        New York, New York  10005
        Tel: (212) 907-0700
        Fax: (212) 818-0477
        jbernstein@labaton.com
        dgoldsmith@labaton.com
        mhrutkay@labaton.com

        *Liaison Counsel for Lead Plaintiff*
        *KBC Asset Management NV*

        James M. Hughes (*pro hac vice pending*)
        William S. Norton
        MOTLEY RICE, LLC
        28 Bridgeside Boulevard
        Mount Pleasant, South Carolina  29464
        Tel: (843) 216-9000
        Fax: (843) 216-9450
        jhughes@motleyrice.com
        bnorton@motleyrice.com

        *Lead Counsel for Lead Plaintiff*
        *KBC Asset Management NV and the Class*