UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

INTERNATIONAL ASSOCIATION OF          :
HEAT AND FROST INSULATORS AND         :
ASBESTOS WORKERS LOCAL #6             :
PENSION FUND, *individually and on*   :
*behalf of all others similarly situated*, :
                                      :          15cv2492
           Plaintiff,                 :
                                      :          OPINION & ORDER
           -against-                  :
                                      :
INTERNATIONAL BUSINESS                :
MACHINES CORPORATION, *et al.*,       :
                                      :
           Defendants.                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

WILLIAM H. PAULEY III, District Judge:

       In October 2014, International Business Machines Corp. ("IBM") announced that it was taking a $2.4 billion write-down in connection with transferring its microelectronics business to another company. Following that announcement—which coincided with the disclosure of disappointing third-quarter operating results—IBM's share price dropped by approximately 17%. Two separate cases pending before this Court allege that Generally Accepted Accounting Principles ("GAAP") required IBM and its corporate officers to record an earlier impairment of its microelectronics assets, and that IBM's stock price was overvalued and fell as a result of the divestiture announcement.

       This action is brought under Section 10(b) of the Securities Exchange Act and its implementing rule, 10b–5, on behalf of a putative class of investors in IBM common stock between January 22, 2014 and October 17, 2014. The International Association of Heat and Frost Insulators and Asbestos Workers Local #6 Pension Fund filed the original complaint in this action. Subsequently, this Court appointed KBC Asset Management NV and the Operating Engineers Trust Fund as lead plaintiffs. The Amended Complaint names IBM as a defendant,

along with Virginia M. Rometty (IBM's President and CEO), Martin Schroeter (IBM's CFO) and James J. Kavanaugh (IBM's Controller).[1]

Defendants move to dismiss the Amended Complaint for failure to state a claim. Defendants' motion to dismiss is granted.

BACKGROUND

The allegations in the Amended Complaint are presumed true for purposes of this motion. In 2010, IBM established a "2015 Roadmap" strategy to double its earnings per share ("EPS") to $20 within five years. Rometty spearheaded that strategy with Schroeter and Kavanaugh's assistance, and sought to divest IBM of unprofitable business segments.

IBM's microelectronics unit ("Microelectronics")—housed within its Software, Systems and Technology ("STG") business segment—designed and produced microchips at plants (the "Fabs") in East Fishkill, New York and Essex Junction, Vermont. Plaintiffs allege that IBM failed to update the Fabs to be competitive in the market. They marshal confidential witnesses from both facilities to buttress those allegations. For example, a former East Fishkill Senior Engineering Manager states that IBM stopped investing in the facility after 2010 and failed to make necessary infrastructure improvements. Similarly, a former contractor represented that the Essex Junction facility was outdated and no longer produced chips at a profitable scale. Notably, chips manufactured at East Fishkill were used almost exclusively in IBM's mainframes and servers, which were sold by the STG business segment.

Beginning in 2012, Microelectronics suffered significant operating losses. Specifically, between 2012 and 2013, Microelectronics lost $1.358 billion. Toward the end of

---

[1] The other case is brought under Section 502 of the Employee Retirement Income Security Act, 29 U.S.C. § 1132, on behalf of participants in IBM's 401(k) Plus Plan who invested in the IBM Company Stock Fund between January 21, 2014 and October 20, 2014. See Jander v. International Business Machines Corp., 15cv3781 (S.D.N.Y.). IBM's motion to dismiss that action is addressed in a separate Opinion and Order.

2013, STG suffered pretax losses of $507 million, driven by Microelectronics' pretax loss of $720 million.  At that point, IBM decided to divest itself of the Microelectronics business segment.

In 2014, IBM engaged Goldman Sachs to assist in its sale of Microelectronics.  Of four potential buyers, GlobalFoundries—a competing microchip manufacturer—emerged as the leading candidate.  And while it was reported that IBM had initially sought to sell Microelectronics for $2 billion, GlobalFoundries—which was primarily interested in IBM's engineers and intellectual property—wanted to be paid $2 billion to take the Fabs off IBM's hands.  Disputes over Microelectronics' value led talks to break off for a period of time as late as July 2014.

On October 20, 2014, IBM announced that it would pay GlobalFoundries $1.5 billion to accept Microelectronics.  IBM further disclosed that it would take a $2.4 billion write-down of the entire vale of Microelectronics' assets, as well as $800 million of other unspecified costs.    As part of the deal, GlobalFoundries agreed to be the exclusive supplier of certain semiconductors to IBM for the next decade.  On the same day that deal was announced, IBM disclosed disappointing third-quarter financial results: sales were down 4%, and operating profits per share were down 10%.  Following these announcements, IBM's stock dropped more than 17% from its class-high price of $197.77 per share.

Throughout the class period, Defendants stated consistently that their long-lived assets were tested for impairment, that there were no material impairments of non-financial assets, and IBM was on track to reach its goal of $20 EPS.

LEGAL STANDARD

To withstand a motion to dismiss, pleadings "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Courts must accept as true all well-pleaded factual allegations.  See Hooks v. Forman, Holt, Eliades & Ravin, LLC, 717 F.3d 282, 284 (2d Cir. 2013).  Additionally, courts may consider "legally required public disclosure documents filed with the SEC" as well as documents "incorporated into the complaint by reference" or relied upon by the plaintiff "in bringing suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.

Under Fed. R. Civ. P. 9(b), securities-fraud complaints must satisfy heightened pleading requirements, "stating with particularity the circumstances of fraud."  Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015) (citation omitted).  Securities-fraud claims are also subject to the "[e]xacting pleading requirements" of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007), which provides that a complaint shall state with particularity "all facts on which [the] belief [that a statement is misleading] is formed," 15 U.S.C. § 78u4(b)(1)(B), and "facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2)(A).

DISCUSSION

Rule 10b–5, promulgated under Section 10(b) of the Securities Exchange Act, prohibits the "mak[ing][of] any untrue statement of material fact" in connection with the purchase or sale of a security.  17 C.F.R. § 240.10b–5(b).  Plaintiffs must allege that the defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that

the plaintiff's reliance was the proximate cause of its injury." Blanford, 794 F.3d at 305 (citation omitted).

Among other arguments, Defendants assert that Plaintiffs fail to: (1) identify any material misrepresentations or omissions; (2) plead scienter; or (3) plead loss causation.

I.   Material Misrepresentations or Omissions

The statements that Plaintiffs allege were materially false or misleading fit broadly into three categories: (1) representations that there were no material impairments of non-financial assets; (2) representations that IBM's financials had been prepared in accord with GAAP, and that long-lived assets were properly tested for impairment; and (3) representations that IBM was on track to reach its 2015 Roadmap goal of $20 EPS.  Defendants argue that the Amended Complaint does not identify any material misrepresentations because Plaintiffs' assertion that the write-down of Microelectronics' assets should have been recorded earlier rests on a misapplication of GAAP.   The relevant GAAP standards for assessing the impairment of long-lived assets are compiled in the Financial Accounting Standards Board's ("FASB's") Accounting Standards Codification ("ASC") 360-10-35.

A.   Whether Microelectronics Constituted an Asset Group Under GAAP

The ASC establishes that "for purposes of recognition and measurement of an impairment loss, a long-lived asset or assets shall be grouped with other assets and liabilities at the lowest level for which identifiable cash flows are largely independent of other assets and liabilities."  ASC 360-10-35-23.  Thus, a threshold issue is whether Microelectronics constituted an "asset group" under GAAP for purposes of impairment testing.  Defendants argue that it did not.

"Varying facts and circumstances will inevitably justify different groupings of assets for impairment review.  While grouping at the lowest level for which there are identifiable

cash flows for recognition and measurement of an impairment loss is understood, determining that lowest level requires considerable judgment." ASC 360-1-055-35. According to Defendants, Microelectronics was "vertically integrated" into STG because STG's product lines were dependent on Microelectronics' manufacturing activity. Thus, because the specialized chips manufactured by Microelectronics were primarily used in STG's products, which were used across business segments, Microelectronics could not be isolated as a stand-alone asset group.

Plaintiffs counter that Microelectronics' cash flows were both identifiable and largely independent of IBM's other assets and liabilities. With respect to identifiability, IBM's own disclosures demonstrate that it tracked Microelectronics' revenues. For example, IBM reported that "[t]he decrease in external gross profit in 2013 versus 2012 . . . was driven [among other things] by lower margins in . . . Microelectronics (0.7 points)." (Portnoy Decl. Ex. C (IBM 2013 Annual Report) at 40.) Moreover, on September 30, 2014, IBM independently reported Microelectronics' financial results—pre-tax losses of over $700 million—after designating Microelectronics as a "discontinued operation." IBM deemed Microelectronics a "discontinued operation" because ASC 205-05-1 requires such reporting on any "component of an entity" when it "is classified as held for sale." ASC 205-10-20. Critically, a "component of an entity" is defined as "operations and cash flows that can be clearly distinguished, operationally and for financial reporting purposes, from the rest of the entity. A component of an entity may be a reportable segment or an operating segment, a reporting unit, a subsidiary, or an asset group." ASC 205-10-20 (emphasis added). IBM's designation of Microelectronics as a "component of an entity" in September 2014 permits this Court to make a reasonable inference that Microelectronics could have been construed as an independent "asset group" for purposes of impairment testing.

Defendants also argue that GAAP expressly acknowledges the business reality that certain assets—which may operate at a loss—are properly grouped with other assets when they are integral to the profitability of a larger asset group.  While this is true, "[t]he primary issue underlying the grouping of long-lived assets is when, if ever, it is appropriate to offset unrealized losses on some assets by unrealized gains."  FASB SFAS No. 144.  As evidenced by IBM's 2014 10-K, Microelectronics' $720 million 2013 operating loss was a major contributor to STG's overall 2013 operating loss of $507 million.  But for purposes of this motion, those numbers do not compel the conclusion that Microelectronics' losses were integral to the STG's profits.

Plaintiffs' argument is supported by Davidco Inv'rs, LLC v. Anchor Glass Container Corp., No. 8:04-CV-2561-T-24 (EAJ), 2006 WL 2092280 (M.D. Fla. July 26, 2006).  There, plaintiffs argued that the loss of a substantial contract for a manufacturing plant was a "triggering event" under GAAP which required the company to recognize an impairment loss.  The defendants countered that even if that specific plant was unprofitable, "its assets could still have produced undiscounted future cash flows that would have covered their carrying values."  Davidco Inv'rs, 2006 WL 2092280 at *4.  The district court declined to accept defendants' argument on the motion to dismiss, finding that plaintiffs had alleged enough facts giving rise to an inference that the plant was impaired.  Davidco Inv'rs, 2006 WL 2092280, at *4.[2]  The same principles apply here: while IBM raises strong arguments that Microelectronics was so vertically

---

[2] See also Davidco Inv'rs, LLC v. Anchor Glass Container Corp., No. 8:04-cv-2561T-24 (EAJ), 2006 WL 547989, at *14 (M.D. Fla. Mar. 6, 2006) ("SFAS 144 requires a company to analyze the future cash flows from the asset and compare it to the asset's carrying value, which indicates that an impairment can occur while the asset is still being used by the company.  [Defendant]'s statement . . . about its SFAS 144 analysis (that it evaluates the value of its long-lived assets whenever adverse events or changes in business climate indicate that the expected undiscounted future cash flows from the related asset may be less than previously anticipated) supports the conclusion that an impairment can occur while the company continues using the asset.").

integrated into STG that it could not be classified as a stand-alone asset group, the allegations in Plaintiffs' complaint—particularly in view of IBM's apparent ability to independently account for Microelectronics' operating losses—sufficiently allege that it could constitute an "asset group" for purposes of GAAP impairment testing.

B. Impairment Indicators

Before determining whether to record an impairment for long-lived assets or an asset group, an entity must determine whether indicators of impairment are present such that the carrying value of the asset or asset group may not be recoverable. ASC 360-10-35-21. The ASC provides a non-exhaustive list of impairment indicators, four of which are relevant to Plaintiffs' allegations here: (1) "a significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition"; (2) "a significant decrease in the market price of a long-lived asset (asset group)"; (3) "a current-period operating or cash flow loss combined with a history of operating or cash flow losses . . . with the use of a long-lived asset (asset group)"; or (4) "a current expectation that, more likely than not, a long-lived asset (asset group) will be sold . . . before the end of its previously estimated useful life." ASC 360-10-35-21. Defendants argue that Plaintiffs fail to plead that any of these impairment indicators were present.

1. Significant Adverse Change in Use or Physical Condition

Plaintiffs' allegations concerning the conditions and uses of the Fabs fail to raise an inference that IBM should have tested for impairment because those allegations do not adequately plead a "significant adverse change" in how the Fabs were "being used" or their "physical condition." Regarding the East Fishkill Fab, it is clear from the Amended Complaint that the factory continued to supply STG with chips. And no authority before this Court indicates that Plaintiffs' allegations regarding underutilized capacity or a furlough of workers

should be construed as impairment indicators.  As for the Essex Junction Fab, Plaintiffs concede

that the plant's equipment was well-maintained.  The allegations of obsolescence rely

predominantly on critiques that IBM failed to invest enough to produce non-CPU chips at a

profitable scale.  But these are critiques of Defendants' business model, not actual allegations of

obsolescence constituting an impairment indicator under GAAP.  Cf. In re Ibis Tech. Sec. Litig.,

422 F. Supp. 2d 294, 297–314 (D. Mass. 2006) (distinguishing sufficient allegations—that

certain semiconductors were widely recognized as "virtually obsolete"—from allegations that

assets were merely devalued "based on wholly subjective criteria").

2.  Market Price and Losses

Plaintiffs argue that Microelectronics' losses of $638 million, $720 million, and

$619 million in 2012, 2013, and the first three quarters of 2014, respectively, were indicators that

impairment testing was necessary.  With respect to the losses, Defendants argue that these

numbers do not reflect the value generated by Microelectronics' chips that were used internally

by IBM and then sold as part of STG products.  But this argument is identical to the grouping

argument previously addressed.

Defendants also attack Plaintiffs' assertion that Microelectronics' assets were

"worthless," arguing that it fails to account for, among other things, the benefit IBM received

from GlobalFoundries' agreement to sell IBM's proprietary chips exclusively to IBM for 10

years.  But the sufficiency of Plaintiffs' allegations does not turn on their hyperbolic

proclamation that Microelectronics' assets were worthless.  Rather, it turns on, among other

things, the truth of IBM's representations that it tested for impairment whenever events or

changes in circumstances indicated that the carrying amount of its long-lived assets may not have

been recoverable.  Because Plaintiffs have pled that Microelectronics could be construed as a

stand-alone asset group, it is plausible that Microelectronics' losses, combined with the

allegations that the Fabs' value were significantly depreciated, constituted GAAP impairment indicators.[3]

### 3.   Likelihood of Sale

The ASC required IBM to test Microelectronics' assets for impairment if the company had "a current expectation that, more likely than not, a long-lived asset (asset group) would be sold or otherwise disposed of significantly before the end of its previously estimated useful life" i.e., "a level of likelihood that is more than 50 percent."  ASC 360-10-35-21.[4]  Courts have dismissed securities-fraud claims alleging a failure to take an earlier write-down where the complaint fails to specifically allege when the write-down should have occurred.  See Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 410 & n.10 (S.D.N.Y. 2007) (dismissing claims based on allegations that a $500 million impairment charge should have been taken before the quarter in which the decision to sell the assets was finalized); see also Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc., 720 F. Supp. 2d 517, 547 (D.N.J. 2010) ("Other than complaining that Defendants were untimely in disclosing the impairment charge . . . Plaintiff never alleges how much earlier, in accordance with GAAP, [Defendant] should have recorded the impairment charge or how much the charge should be.").

By the end of September 2014—when it was clear that the GlobalFoundries deal would come to fruition—IBM recognized the impairment of the Fabs.  Plaintiffs allege that the likelihood of Microelectronics' sale was greater than 50 percent at some point before 2014, as demonstrated by, among other things. IBM's hiring of Goldman Sachs to assist with the sale in

---

[3] Indeed, as Defendant Schroeter acknowledged during a November 2014 IBM Investor Forum, IBM was "a subscale manufacturer in semiconductors . . . And when you're subscale, you just can't get the economics to work out."  (AC ¶ 73).

[4] The parties seem to agree that impairment testing would be required if a sale was more likely than not regardless of whether Microelectronics constituted a stand-alone asset group.

in early 2014.  Plaintiff does not specifically allege when such a sale was more likely than not to occur.

Certainly, Plaintiffs have plausibly pled that Defendants desired to sell Microelectronics before 2014.  But Defendants argue compellingly that Plaintiffs do not allege facts indicating that a sale was more likely than not prior to 2014, noting that the Amended Complaint concedes the paucity of interested buyers and seemingly uncertain negotiations late into 2014.   The Amended Complaint indicates that three of the four potential buyers never had any interest in acquiring the Fabs and were more focused on IBM's intellectual property and expertise.  Likewise, the Amended Complaint indicates that talks with GlobalFoundries temporarily broke off as late as July 2014.  Given those allegations, Plaintiffs have failed to allege that Defendants should have considered Microelectronics' sale more probable than not prior to 2014.

II.   <u>Scienter</u>

As discussed above, the Amended Complaint plausibly pleads that Microelectronics' decreased value, combined with its operating losses, may have constituted an impairment indicator under GAAP.  However, "[a]llegations of a violation of GAAP . . . without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."  <u>Chill v. Gen. Elec. Co.</u>, 101 F.3d 263, 270 (2d Cir. 1996).  Under Rule 9(b) and the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)).  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  <u>Tellabs</u>, 551 U.S. at 324.  To plead a "strong inference" of scienter, plaintiffs must allege "facts (1) showing that the defendants had both motive and

opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99.   Defendants argue that Plaintiffs have failed to plead scienter with respect to both: (1) statements regarding IBM's accounting, and (2) forward-looking statements concerning projected EPS.

      A. Statements Regarding IBM's Accounting

"If all that is involved is a dispute about the timing of the writeoff . . . the inquiry [i]s framed by the recklessness standard—that is, whether the failure to take a write-down amounted to highly unreasonable conduct which represents an extreme departure from the standards of ordinary care." Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) (quotations, citations, and alterations omitted).  To demonstrate recklessness, Plaintiffs must allege "that the failure to take an impairment charge earlier was . . . an error so grievous that it exceeded differences over accounting principles and rose to the level of fraud." In re Loral Space & Commc'ns Ltd. Secs. Litig., No. 01-cv-4388(JGK), 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004).

In order to allege scienter, Plaintiffs rely predominantly on (1) the magnitude of the write-down, (2) Microelectronics' crucial role in Defendants' 2015 Roadmap strategy, and (3) the certifications signed by the individual Defendants—mandated by the Sarbanes-Oxley Act ("SOX")—stating that IBM's financial statements were prepared in accord with GAAP. Plaintiffs all but concede that any of those allegations, viewed in isolation, would be insufficient to allege scienter.  For example, to the extent Plaintiffs rely on Defendants' desire to achieve the 2015 Roadmap target, such allegations only implicate "[t]he motive to maintain the appearance of corporate profitability," which "does not entail concrete benefits" necessary to plead scienter. Chill, 101 F.3d at 268 (internal quotations and citations omitted).  Likewise, "required certifications under Sarbanes–Oxley section 302(a) . . . add nothing substantial to the scienter

calculus" because "allowing Sarbanes–Oxley certifications to create an inference of scienter in every case where there was an accounting error or auditing mistake made by a publicly traded company would eviscerate the pleading requirements for scienter set forth in the PSLRA." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1003–04 (9th Cir. 2009)) (quotations, citations and brackets omitted); see also In re Molycorp, Inc. Sec. Litig., No. 13-cv-5697 (PAC), 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015) ("[I]n the absence of more particularized allegations of scienter, that certain Defendants signed or certified SEC disclosures is insufficient to support a finding of scienter."). Lastly, "the magnitude of [a] write-down[] is insufficient to plead scienter." Plumbers & Steamfitters Local 773 Pension Fund, 694 F. Supp. at 302; see also Caiafa, 525 F. Supp. 2d at 413 ("[T]he size of the fraud alone does not create an inference of scienter.")

Of course, a "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). But even the cases relied on by Plaintiffs demonstrate the insufficiency of their allegations here. For example, in Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 199–200 (S.D.N.Y. 2010), Judge Sweet found that plaintiffs pled scienter in connection with an alleged failure to record a write-down where sixteen confidential witnesses helped establish "direct knowledge and access to information" belying defendants' public statements, and individual defendants were alleged to have conducted large insider stock sales during the class period. Here, by contrast, Plaintiffs essentially ask this Court to infer knowledge of an alleged GAAP violation based on conjecture. Indeed, "[t]here are no allegations that there were any internal reports that suggested that the failure to take an impairment charge earlier was an incorrect application of accounting principles, much less an error so grievous that it exceeded differences over accounting principles and rose to the level of fraud." In re Loral Space &

Commc'ns Ltd. Sec. Litig., No. 01-cv-4388 (JGK), 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004).

        "GAAP tolerates a range of reasonable treatments, leaving the choice among alternatives to management." City of Omaha v. CBS Corp., No. 08-cv-10816 (PKC), 2011 WL 2119734, at *6 (S.D.N.Y. May 24, 2011) (citation and quotations omitted), aff'd, 679 F.3d 64 (2d Cir. 2012). And "[g]iven the flexibility in interpreting GAAP and financial reporting requirements, deference is afforded executives absent evidence of corresponding fraudulent intent." Plumbers & Steamfitters Local 773 Pension Fund, 694 F. Supp. 2d at 302 (internal quotation marks omitted). GAAP specifically recognizes that flexibility with respect to asset grouping, noting that a decision about asset grouping "requires considerable judgment." ASC 360-1-055-35. Defendants credibly argue—even in the context of Plaintiffs' allegations—that it may have been entirely reasonable for Microelectronics to be grouped within the larger STG segment of IBM, thereby not requiring a write-down or even triggering impairment indicators until it was held for sale. Accordingly, the Amended Complaint fails to raise a strong inference that "the need to write-down [Microelectronics] . . . was so apparent to [Defendants] before the announcement, that a failure to take an earlier write-down amounts to fraud." City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Co., 655 F. Supp. 2d 262, 268–69 (S.D.N.Y. 2009) (ellipses, original brackets, and quotation marks omitted).

    B. Forward-Looking Statements

        Defendants argue that IBM's statements concerning EPS projections fall within the PSLRA's safe harbor for "forward-looking statements." See 15 U.S.C. § 78u–5(c)(1)(A)(i). Under that safe harbor, "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to

prove that it was made with actual knowledge that it was false or misleading." Slayton v. Am. Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010).

"The term 'forward-looking statement' [includes] a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share."). 15 U.S.C. § 78u-5(i)(1)(A). Thus, Defendants' statements that they were "on track toward [the] 2015 roadmap for operating EPS of at least $20," and "expect[ed] to deliver at least $20 of operating EPS in 2015" were forward-looking statements. See Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 255–56 (3d Cir. 2009) (holding that a company's statement that it was "on track" to meet a future projection "does not transform the statements, or any part of them, into non-forward-looking assertions outside of the Safe Harbor."); In re Molycorp, Inc. Sec. Litig., No. 13-cv-5697 (PAC), 2015 WL 1097355, at *14 (S.D.N.Y. Mar. 12, 2015) (holding that a statement that a company believed its product was "on the path for market acceptance" was "forward looking").

"[B]ecause the safe harbor specifies an 'actual knowledge' standard for forward-looking statements, the scienter requirement for forward-looking statements is stricter than for statements of current fact. While liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." Slayton, 604 F.3d at 773 (citations and quotation marks omitted). As discussed above, Plaintiffs plead that there may have been a GAAP violation concerning Microelectronics' valuation. But Plaintiffs fail to explain how those allegations strongly support an inference of actual knowledge that the EPS projections lacked a reasonable basis when they were made. If anything, the most reasonable inference is that Defendants' attempts to divest Microelectronics were an effort to meet the projections they hoped to achieve. Accordingly, Plaintiffs' claims based on the statements regarding EPS projections must be dismissed. See In re WEBMD

Health Corp. Sec. Litig., No. 11-cv-5382 (JFK), 2013 WL 64511, at *12 (S.D.N.Y. Jan. 2, 2013) ("There is a missing link between Defendants' cognizance of potentially adverse business conditions and Plaintiffs' accusation that the statements and projections were not simply too optimistic but actually false and made with an intent to deceive, manipulate, or defraud.  In the absence of any compelling and specific showing by Plaintiffs, it is far more plausible that Defendants were not deceitful but mistaken.").

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted.  The Clerk of Court is directed to terminate any pending motions and close this case.

Dated: September 7, 2016
       New York, New York

SO ORDERED:


_____
          WILLIAM H. PAULEY III
                 U.S.D.J.